Emilio Valdez **MAINERO, a/k/a Ricardo Gonzalez Leon; a/k/a Ricardo Emilio Valdez–Mainero; a/k/a Emilio Ricardo Valdez, Petitioner–Appellant,**

v.

**Stephen S. GREGG, Respondent– Appellee.**

clearly erroneous.").

Alfredo Hodoyan Palacios, a/k/a El Lobo 88, Petitioner–Appellant,

v.

Stephen S. Gregg, United States Marshal for the Southern District of California, Respondent–Appellee.

Nos. 98–55067, 98–55069.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 1998.

Decided Jan. 7, 1999.

Michael Pancer, San Diego, California, for petitioners-appellants.

Gonzalo P. Curiel, Assistant United States Attorney, San Diego, California, for respondent-appellee.

Before: BOOCHEVER, REINHARDT and RYMER, Circuit Judges.

RYMER, Circuit Judge:

Emilio Valdez Mainero (Valdez) and Alfredo Hodoyan Palacios (Hodoyan) were certified as extraditable to Mexico on charges of murder and criminal association with the Arellano Felix drug trafficking organization (AFO).[1] Since there is no right of appeal

---

1. Mexico sought extradition pursuant to an extradition treaty between Mexico and the United States, Extradition Treaty, May 4, 1978, U.S.-Mex., 31 U.S.T. 5059, T.I.A.S. 9656, and federal laws supplementing and implementing such treaties, 18 U.S.C. § 3184 *et seq.* Valdez and Hodoyan were charged with separate crimes, but their cases have been considered together throughout because of interrelated facts and evidence.

from extradition orders, Valdez and Hodoyan filed petitions for writs of habeas corpus in the district court, 28 U.S.C. § 2241, which the court denied. Valdez and Hodoyan seek reversal primarily on the ground that the magistrate judge should not have allowed into evidence statements allegedly extracted by torture. They also urge us to decline extradition on humanitarian grounds. While the magistrate judge, the district judge, and we are troubled by evidence suggesting that torture may have occurred, we agree with the district court that the competent evidence supports the magistrate judge's finding of probable cause and that there is no basis for applying a humanitarian exception to extradition in this case. Therefore, as we have jurisdiction, 28 U.S.C. § 1291 and 28 U.S.C. § 2253, we affirm.

## I

Mexico sought extradition of Hodoyan based on two charges: (1) the first degree murders of Ernesto Ibarra Santes (Ibarra), who was then Sub–Delegate of the National Institute for the Combat of Drugs, Mexican Judicial Agents Israel Moreno Flores and Juan Aaron Rosas Gallegos, and taxi driver Juan Arturo Hernandez Lizardi on September 14, 1996; and (2) criminal association (the Mexican legal equivalent of conspiracy) through the AFO to plan and carry out assassinations of perceived AFO enemies. Valdez's extradition was requested on charges of criminal association by carrying out assassinations for the AFO, and the first degree murder of Jesus "Bebe" Gallardo Vigil (Gallardo) and Jesus Sanchez Angulo (Sanchez) on April 9, 1996.[2]

## A

### Mexico's Evidence

Mexico's extradition submissions[3] include detailed witness statements made on October 12 and 13, 1996 by Gerardo Cruz Pacheco (Cruz), indicating that he was associated with the AFO and participated in both the Ibarra

and Gallardo murders; September 29 and October 2 by Francisco Cabrera Castro (Cabrera), who said he was involved in the Ibarra murder; and September 30 by Gilberto Vasquez Culebro (Vasquez), who identified himself as a member of the AFO and provided information about the individuals involved in the Gallardo murder. Each witness was represented by counsel and made his statements to an agent of the Mexican Federal Public Prosecutor. With the exception of Vasquez, each also made preparatory statements before the First District Judge of Federal Criminal Proceedings in the State of Mexico. Fausto Soto Miller (Soto) also made two statements, on September 27 and September 30, to an agent of the Federal Prosecutor, as well as a preparatory statement on October 2, 1996 before the First District Judge. Gustavo Miranda Santacruz (Miranda) was interviewed by an Assistant United States Attorney (AUSA) on November 19, 1996 in a San Diego hospital after being shot, allegedly by a member of the AFO; he identified Hodoyan and Valdez as members of the AFO who were involved in the charged murders, and he explained the motive for both. Finally, Alejandro Enrique Hodoyan Palacios (Alejandro), Hodoyan's brother, gave a videotaped deposition in Mexico on November 30, 1996, and was interviewed in the United States in February 1997 about his brother's and Valdez's involvement in both murders.

### 1. The Ibarra Murders

Ibarra (and others in his taxi) were killed at approximately 12:20 a.m. on September 14, 1996 by gunmen using long-range weapons. According to Cabrera's statement, he participated in the Ibarra murders along with Hodoyan, Fabian Martinez Gonzalez (Martinez), Cruz, and others.[4]

Hodoyan and Martinez called Cabrera on September 13, 1996, and instructed him to pick them up at the International Airport in Mexico City between 1:30 p.m. and 2:00 p.m.

---

**2.** An additional charge, carrying a firearm exclusive to the military, was abandoned.

**3.** The requesting party under Article 10(7) of the Treaty must provide evidence which, in accordance with the laws of the requested party, would justify the apprehension and commitment

for the trial of the person sought if the offense had been committed there.

**4.** In their witness statements, Cabrera, Cruz, and Soto refer to each other and their associates by code name. However, we use given names for ease of reference.

Martinez telephoned Cruz the same day and asked him to drive a navy blue Cutlass with a suitcase of weapons to the airport. Cabrera picked up Hodoyan and the others at the airport and the group went to a restaurant. There, they met Cruz, who had a gray Spirit and a dark blue Cutlass, the vehicles later used in the assassination of Ibarra.[5]

On instructions from Martinez, Cabrera rented two rooms at the J.R. Hotel, close to the airport, under a false name. At approximately 10:40 p.m., Martinez informed the group that Ibarra had arrived at the airport. The group went to the hotel parking lot, where Martinez unlocked the trunk of the gray Spirit and opened a suitcase containing AK–47 submachine guns. Hodoyan and his accomplices drove the Spirit to the airport parking structure where they met Cruz, who was waiting in the dark blue Cutlass. Cruz confirms that the Spirit driven by Cabrera parked next to him. Martinez and others got out of the Spirit and Martinez told Hodoyan to "set the things [firearms] now." Cabrera watched Hodoyan, who was sitting in the back seat of the Spirit, recline the seat and retrieve the weapons from the trunk. Eduardo Leon took three firearms from the floor of the Spirit and put them in the Cutlass. At approximately 11:15 p.m., Hodoyan was paged by Martinez-the pre-arranged signal to go to the taxi stand. Immediately thereafter, Hodoyan told the group "let's get out of here."

The two cars left the parking structure and headed to the taxi stand. At approximately 11:40 p.m., Martinez identified the targeted taxi. Martinez got into the gray Spirit, where Hodoyan handed him a rifle. Cabrera, who was driving the Spirit, followed the taxi. The Cutlass followed the Spirit. When they caught up to the taxi, Martinez (from the front seat) and Isaac Contreras Ayala (Contreras) (from the back seat) shot at the passengers in the taxi. Almost immediately, the dark blue Cutlass arrived. The vehicles then left the scene, regrouped, and the passengers in the Cutlass gave their

weapons to Hodoyan and Contreras to put into the trunk of the Spirit.

The next day, Cabrera met with Martinez and Hodoyan, who were talking about the assassination. Cabrera heard them say, "We screwed that ... doctor." When Cabrera asked if the doctor was their enemy, Martinez responded, "Yes. He was a very bad enemy of ours and of the boss's." Cabrera understood him to be referring to Ramon Arellano Felix.

In addition, Soto's statement indicates that Hodoyan called September 17 and told him to meet Cabrera in Mexico City, where Cabrera was to give him a blue Cutlass to hide because the car had been used to carry out a special job in Mexico City against some federal judicial police who were travelling in a taxi. Miranda also indicates that the motive for Ibarra's murder was to eliminate an enemy of the AFO. Martinez had asked Miranda to participate in the Ibarra slaying and to bring his AK–47, but Miranda refused and Martinez became furious. Three weeks later Miranda was shot.

### 2. The Gallardo Murders

On April 9, 1996, Gallardo and Sanchez were murdered at the Holiday Inn in Toluca, Mexico. Cruz identified himself as a participant in these murders in his October 12, 1996 statement to Mexican authorities. He states that Valdez, Martinez, and Contreras were also involved and that he was instructed by Martinez to meet them at the Glorieta del Angel at 6:00 p.m. From there, Valdez and Martinez drove a white Volkswagen (which an eyewitness also saw) carrying short range weapons, and Contreras and Cruz drove a navy blue Cutlass to the Holiday Inn. Valdez told Contreras to wait for him and to block the exit when he saw the Volkswagen leave the parking lot. This would ensure that they couldn't be followed. At approximately 9:30 p.m., Valdez and Martinez found Gallardo. They shot and killed him and Sanchez, who was with Gallardo at the time. Cruz heard

---

5. Other evidence offered by Mexico ties both Cabrera and Hodoyan to both vehicles. Carlos Arturo Zaro Gutierrez states that he and Cabrera were arrested September 29 while driving a 1991 blue Cutlass, and that he had seen his friend Cabrera driving a 1995 gray Spirit. Alejandro also said that his brother Hodoyan was driving in a white Spirit containing firearms when he was arrested, and that he had driven a blue Cutlass provided by Valdez in the past.

the shots, and then he saw the white Volkswagen speed out of the parking lot. He followed in the navy blue Cutlass.

Valdez, Martinez, and the others met in San Mateo Atenco, where Valdez stated that " '[t]he Baby' paid me off. Nobody threatens my brother because the moron who does it, dies." Testimony from other sources indicates that Gallardo had previously threatened Valdez's brother with a firearm. Alejandro testified that Valdez told him that Gallardo was also murdered for identifying Benjamin Arellano as the owner of a load of marijuana and for working with a competitor of Benjamin Arellano Felix. Several days later, Martinez told Cruz that he would be paid to hold the .38 Super and the 9mm guns that they had used to kill Gallardo and Sanchez.

Based on his acquaintance with the perpetrators, his conversations with them, and his own presence at some of the events, Miranda indicated that Valdez and Martinez committed the Gallardo murder using a white-colored vehicle and another car for protection. He added that the motivation for the murder was Gallardo's alleged threats to Valdez's brother with a firearm. Because at times he was a cook for Benjamin Arellano Felix (which Miranda confirmed), Soto stated that he was aware of the problems between Valdez and Gallardo arising out of a threat against Valdez's brother. Finally, Vasquez recounts a visit from Valdez, Martinez and Hodoyan in March 1996, after which they left for Mexico City in a light gray Spirit. They returned in April, stating that they were running from the authorities because they had committed a murder in Mexico City with which their boss, Ramon Arellano Felix, would be pleased.

## B

### Recantations

Hodoyan offers evidence that Cabrera, Cruz and Soto were subjected to torture and were under duress at the time of their statements. Likewise, Valdez offers evidence that Cruz, Soto, Alejandro and Vasquez were tortured. Valdez introduced recantations by Cruz, Soto and Alejandro; Hodoyan introduced recantations from Cabrera as well as Cruz and Soto. These were in the form of

testimony before a judge of the First District of Federal Criminal Proceedings in the State of Mexico when each was arraigned on charges filed by the Republic of Mexico based upon the statements previously given to the public prosecutor.

Cabrera did not testify to any physical injuries, but he claimed that he was kidnapped, threatened, and forced to record the statements attributed to him and that he does not actually know the persons referred to in his statements. Cruz had multiple burns, which his statement attributed to an incident several days before when he was inspecting the exhaust pipe of a vehicle, and an injury to his right leg, which he claimed resulted from a fight. The judge noted residual signs of significant physical injury. Cruz's statement to the judge rejects the alias ascribed to him, his reported rank in the infantry, his membership in the Presidential General staff, the date of arrest, and his resignation from the Department of National Defense. Soto's three statements do not reference any injury and a medical examination after his September 27 statements found no traces of recent physical wounds. He did, however, indicate to the judge that his statements were lies and that he was arrested September 12, not September 27, which is the arrest date noted in the statements to the federal prosecutor.

In addition, Valdez and Hodoyan offered an unsigned and uncertified declaration of First Sergeant Vicente Ruiz Martinez to confirm Soto's testimony that he was arrested no later than September 15, 1996, prior to the September 27 date set forth in Soto's original statements. They also offered a handwritten declaration of Alejandro, dated March 3, 1997. The document was written by Alejandro's father and it summarized what Alejandro told his family about being pressured by General Gutierrez Rebello, DEA and FBI agents to sign a confession. Finally, Valdez filed a declaration of Alejandro's brother, Augustin, with Alejandro's personal notes, which indicated that Alejandro told him that Mexican officers intended to torture and kill Hodoyan should he be extradited to Mexico.

## C

The magistrate judge found that probable cause existed for each crime charged. He rejected Valdez and Hodoyan's claims that most of the evidence submitted against them was unreliable because it was extracted by torture, concluding that there was no reliable evidence of torture. He also held that the allegations of torture supported by some of the self-serving statements of the witnesses and some factual conflicts having to do with arrest dates of Soto and Cruz were unpersuasive as offered to obliterate probable cause. In addition, he declined to create a humanitarian exception in either case.

On December 22, 1997, Valdez and Hodoyan filed habeas corpus petitions and requested a stay of extradition in the district court. The court declined to grant a stay based on the government's representations that it would not extradite either one before the district court could hear and decide the petitions. However, while their petitions were pending before the district court, Hodoyan and Valdez asked the magistrate judge to reconsider his findings of extraditability in light of the declarations of Hodoyan's father and Sergeant Vicente Ruiz. The magistrate judge, in an order dated January 15, 1998, concluded that neither declaration offered information that affected his probable cause determination and denied the motion.

In an order also dated January 15, 1998, the district court denied Valdez and Hodoyan's petitions for habeas corpus relief. The court found that competent evidence supported the extradition orders and that allegations of torture and other challenges to Mexico's evidence failed to negate the existence of probable cause. It also declined to create a humanitarian exception to extradition for Hodoyan and Valdez. Hodoyan and Valdez asked this court for an emergency stay of extradition pending appeal. The motion was denied and this timely appeal followed.

## II

Valdez and Hodoyan argue that the magistrate judge erred in admitting and considering evidence that was extracted by torture because as a matter of law, our courts give no credence to and do not consider involuntary statements or the fruits thereof. They further contend that examination into whether information was extracted by torture in Mexico is not restricted by the rule of non-inquiry[6] because the United States government must conform its conduct to the requirements of the Constitution in carrying out its treaty obligations. Finally, they maintain that even if the witness statements are true and admissible, the manner in which the statements were obtained required the magistrate judge not to rely on them as evidence in this case. Otherwise, they submit, due process is violated. In essence, Valdez and Hodoyan argue that evidence that was allegedly extracted by torture is inadmissible in an extradition hearing. Even if admissible, they argue that an extradition order issued by a United States court cannot be based on unconstitutionally obtained evidence.

## A

"The scope of habeas review of an extradition order is severely limited." *Artukovic v. Rison,* 784 F.2d 1354, 1355–56 (9th Cir.1986). The district court's review is limited to "whether the magistrate [judge] had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused was guilty." *Quinn v. Robinson,* 783 F.2d 776, 790 (9th Cir.1986) (quoting *Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925)). A "reasonable ground" exists where the record contains "competent evidence to support the conclusion that there was probable cause to believe the petitioner guilty." *Zanazanian v. United States,* 729 F.2d 624, 626 (9th Cir.1984). Factual determinations by a magistrate judge in an extradition proceeding are reviewed for clear error. *Quinn,* 783 F.2d at 792. "The credibility of witnesses and the weight to be accorded their testimony is

---

6. The so-called "rule of non-inquiry" recognizes that "[a]n extraditing court will generally not inquire into the procedures or treatment which await a surrendered fugitive in the requesting country." *Arnbjornsdottir–Mendler v. United States,* 721 F.2d 679, 683 (9th Cir.1983) (citations omitted).

solely within the province of the extradition magistrate." *Id.* at 815. And a probable cause finding "must be upheld if there is any competent evidence in the record to support it." *Quinn,* 783 F.2d at 791 (citations omitted); *see also Collins v. Loisel,* 259 U.S. 309, 317, 42 S.Ct. 469, 66 L.Ed. 956 (1922).

There is no question here that the magistrate judge had jurisdiction or that the offense charged is covered by the treaty. Thus we focus, as did the district court, on whether there was any competent evidence to support the conclusion that there was probable cause to believe the petitioners guilty. *Id.* First, however, we consider whether Mexico's evidence should have been excluded altogether by reason of an exclusionary rule of the sort contemplated by Valdez and Hodoyan, or because it was inherently unreliable.

## B

■ Valdez and Hodoyan contend that even if the statements of the witnesses against them are true and admissible, the magistrate judge's ruling was improper because he relied on unconstitutionally obtained evidence to the extent that he placed credence in evidence obtained by torture. This is not what happened. The magistrate judge found no reliable evidence of torture or duress of the witnesses that was material to his determination of probable cause. Both the magistrate judge and the district court fully and carefully considered the recantations offered by Valdez and Hodoyan, and both acknowledged that the suggestion of torture is present in the record, especially with respect to Cruz, whose injuries are particularly suspicious. However, both judges also meticulously reviewed all the statements; took account of such inconsistencies as there were (especially with respect to the arrest dates of Soto and Cruz); noted the circumstances under which the original statements (given while counseled) and the recanting statements (given at the time of arraignment on charges admitted in the prior statements, effectively as a not-guilty plea) were made; and considered the testimony of Miranda and CW–4, a confidential witness, which independently corroborates the involvement of Hodoyan and Valdez—as well as Cruz, Soto, and

Cabrera—in the AFO and the murders with which each petitioner is charged. Both judges also found the videotaped deposition of Alejandro to be credible evidence of the circumstances under which Mexico's evidence was collected, and that his testimony was not suggestive of torture, coercion or duress.

We hold that, with the possible exception of the witness Cruz, the magistrate did not clearly err in finding there was no reliable evidence of torture or duress of the witnesses. As to Cruz, his recantations did not materially alter his prior statements. Thus, as the magistrate found, none of the evidence on which it is necessary to rely was obtained by torture.

## C

■ Valdez and Hodoyan further submit that no competent evidence exists to support the conclusion that there was probable cause to believe that either knowingly participated in the charged crimes because the government relied on presumptively unreliable and conclusory hearsay and accomplice testimony. *See Bruton v. United States,* 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), *overruling Delli Paoli v. United States,* 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957). However, it is well settled in this circuit that evidence is not incompetent simply because it is hearsay. *See Emami v. U.S. District Court for the Northern Dist. of Cal. (Fed. Republic of Germany),* 834 F.2d 1444, 1451 (9th Cir.1987) (foreign prosecutor's affidavit with summaries of statements admissible); *Zanazanian,* 729 F.2d at 626–27 (police reports containing multiple hearsay are sufficiently reliable to be deemed competent). The Federal Rules of Evidence do not apply in an extradition hearing. *See In re Requested Extradition of Smyth,* 61 F.3d 711, 720–21 (9th Cir.), *amended by* 73 F.3d 887 (9th Cir.1995), *cert. denied,* 518 U.S. 1022, 116 S.Ct. 2558, 135 L.Ed.2d 1076 (1996). It is equally settled that "[s]elf-incriminating statements of accomplices are sufficient to establish probable cause in an extradition hearing." *Zanazanian,* 729 F.2d at 627. The statements of Valdez and Hodoyan's accomplices are self-incriminating, and thus are not unreliable as

a matter of law. *Id.* at 628. *Bruton,* in which the Supreme Court held that a defendant's Sixth Amendment right of confrontation is violated in a joint trial when a non-testifying codefendant's confession inculpating the defendant is admitted, is inapposite because an extradition proceeding is not a trial. Indeed, the very purpose of extradition treaties is "to obviate the necessity of confronting the accused with the witnesses against him." *Zanazanian,* 729 F.2d at 627 (internal quotations and citations omitted).

■ Nor can we say that the magistrate judge abused his discretion in relying on the particular hearsay statements in Mexico's evidence, as they are far more detailed and reliable than those described in *Zanazanian.* The statements were made by percipient witnesses to an agent of the Mexican Federal Public Prosecutor, an agent of the Attorney General of the United States of Mexico, and an Assistant United States Attorney. They are highly detailed. In addition, most of the declarants were represented by counsel, thus increasing the reliability of their statements.

Accordingly, the magistrate judge did not clearly err in considering or relying on Mexico's witness statements simply because they were made by accomplices and included hearsay.

## D

We therefore turn to whether there is any competent evidence to support the magistrate judge's order certifying extradition. Hodoyan and Valdez submit that the witness statements do not establish probable cause to believe that either participated in the crimes for which Mexico seeks extradition. Hodoyan specifically contends that the main support for his extradition comes from statements by Cabrera and Soto, accomplices

whose statements were extracted by torture and whose reliability and credibility are called into question, thus serving to obliterate probable cause. Both Hodoyan and Valdez contend that many of the statements pertain to ballistics analyses, the coroner's report and statements of persons who heard but did not see shots fired or who viewed the scene after the shooting.

■ The magistrate judge and the district court analyzed all the statements offered by Mexico, and by Valdez and Hodoyan, in detail and with respect to each charged crime.[7] We do not repeat or replicate these analyses because they are lengthy and intertwined. Instead, we simply summarize why we agree with the district court that there is competent evidence to support the probable cause determination.

### 1. *Valdez*

■ In Valdez's case there is ample evidence of probable cause independent of statements that were allegedly obtained through torture. Miranda, an acquaintance of both Valdez and Hodoyan, gave a statement to AUSA Gonzalo P. Curiel that is not alleged to be the product of torture. His statement supports both the murder and criminal association charges against Valdez. Miranda knew Valdez (and Hodoyan) while they were working for the AFO. He relates how Gallardo began working for a rival drug organization, and was murdered at the Holiday Inn in Toluca in the first days of April 1996 by Valdez and Martinez, who used a white-colored vehicle and another vehicle for protection. Miranda indicates that Gallardo was killed because Valdez had troubles with him since he had threatened Valdez's brother. Miranda also met Valdez in a stationery shop

---

7. For this reason, we need not reach the question whether recantation evidence is admissible in an extradition hearing. Generally, evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible. *See Charlton v. Kelly,* 229 U.S. 447, 457–58, 33 S.Ct. 945, 57 L.Ed. 1274 (1913). Courts have split on whether recantation evidence is admissible under this rule. *Compare Eain v. Wilkes,* 641 F.2d 504, 511–12 (7th Cir.1981) (holding that the

magistrate judge did not err in refusing to admit recanting statements because they constituted contradictory evidence) *with In the Matter of Extradition of Contreras,* 800 F.Supp. 1462, 1464, 1469 (S.D.Texas 1992) (admitting recantation testimony because if the only evidence of probable cause were confessions that were sufficiently recanted, the existence of probable cause would be negated). We have never determined this issue, and have no need to do so here because the magistrate judge did not refuse to consider Hodoyan's proffered recantation evidence.

after Ibarra was shot and was told by Valdez that he was escaping to San Diego because the Office of the Attorney (in Mexico) had already detained some of his "workmates"; that Martinez was in charge of the Ibarra assassination; and that they had to kill Ibarra because he had said on television that he was going to detain the Arellano Felix brothers. In fact, Valdez did flee to San Diego.

Vasquez, also an admitted member of the AFO, gave a statement that was not recanted which indicates that Valdez, Martinez and Hodoyan visited his home in March 1996 before heading to Mexico City in a light gray Spirit. The same individuals returned in April. They told Vasquez that they had committed a murder in Mexico City and were on the run from the police. They also noted that Ramon Arellano Felix, their boss, would be proud of their recent "work."

The testimony of CW–4, a confidential informant who was detained with Valdez at the Metropolitan Correctional Center in San Diego, California, also supports the criminal association charge. During an interview on December 11, 1996, CW–4 stated that he had known Valdez for many years and that Valdez was involved with the AFO. On or about February 11, 1997, he reported that Valdez had called Benjamin Arellano Felix and Martinez. Valdez told him that the AFO knew that Alejandro, Hodoyan's brother, had been cooperating with the Mexican authorities. Valdez told him that the Hodoyan family was in danger because of Alejandro's cooperation. On February 27, 1997, CW–4 reported that Valdez told him that the AFO had ordered Alejandro to prepare a declaration recanting incriminating statements against Valdez and other AFO members. Valdez said that Alejandro was preparing his declaration, but that the AFO did not trust Alejandro and would kill him once it received the declaration. In fact, the Alejandro declaration was prepared on March 4, 1997. Alejandro was abducted in Mexico on or about March 4 and has not been seen or heard from since.

On March 6 and 8, CW–4 reported that Alejandro had been murdered. He stated that Valdez told him that Alejandro had been pulled from his mother's car and killed. Valdez also told him that Alejandro's mother was instructed to take Alejandro's declaration to Valdez's lawyer, and to prepare a declaration of her own stating that the military had abducted Alejandro. Valdez said that Alejandro's mother had been threatened that her other sons would be killed unless she provided such a declaration. On March 8, Alejandro's mother in fact called the DEA to report that she had learned that Alejandro had been kidnapped by the military. On March 11 and 13, 1997, CW–4 reported that Valdez had bragged that everyone who had turned on him "had been taken care of"; based on their previous conversations, CW–4 believed that Valdez was referring in part to Alejandro. Valdez later verified CW–4's belief by stating that AFO member Ismael Higuera Herrera was responsible for seizing Alejandro from his mother's car.

Thus, Valdez's admissions to Miranda and CW–4 are evidence of his participation in the Gallardo murder and of criminal association with the AFO, without regard to the statements of Cruz, Soto, Alejandro and Vasquez. In addition, Miranda and CW–4's declarations show that Alejandro's recantation, and perhaps the others', were contrived at the behest of the AFO.

Valdez's arguments for discounting the statements of CW–4 and Miranda are unavailing. He contends that there is no indication how Miranda came to know what he represents in his statement, and that he was also an accomplice. But as the magistrate judge noted:

> Miranda's statement was given to an officer of this Court. There is no indication of any coercion or duress, and in fact, Miranda is given "use immunity" with regard to the statement. Miranda's testimony is not only generally consistent with the statements of others, but is based upon his acquaintance and involvement with the individuals described therein.

As we have explained, that some of Miranda's statements are hearsay or that he was an accomplice does not alone make his testimony incompetent. *See Zanazanian*, 729 F.2d at 626–27. Indeed, the magistrate judge found his statements to be credible. Without more than the bare assertion that there are reasons to suspect it, Valdez cannot overcome this credibility determination for

purposes of extradition. *See Quinn*, 783 F.2d at 815.

 Valdez further argues that CW–4's credibility is suspect in light of the fact that he was attempting to get a lower sentence by offering helpful information to the government. However, the magistrate judge's determination that the informant was reliable is within his discretion, *see Quinn*, 783 F.2d at 815, as CW–4's statement was corroborated in material respects by the actual turn of events, such as the report by Alejandro's mother that her son had been abducted. Accordingly, Miranda's testimony, along with CW–4's, provides competent evidence that supports the finding of probable cause to believe that Valdez is guilty of criminal association and of committing the Gallardo and Sanchez murders.[8]

### 2. *Hodoyan*

 Cabrera's statement shows that Hodoyan was involved along with Martinez in setting up the Ibarra murder, and carrying it out. Cruz confirms significant details of Cabrera's involvement and how the operation was orchestrated, including Hodoyan's participation. Soto also confirms Hodoyan's involvement in covering up the murder. While Miranda does not implicate Hodoyan in the murder itself, he corroborates the account by Cabrera and Cruz of how and why the assassination was organized (to eliminate an AFO enemy) and confirms that Soto was in a position to know what was going on because he was a cook for the AFO. Cabrera, Cruz, Soto, and Miranda either identified Hodoyan from photographs provided by the Federal Prosecutor or gave a physical description that was consistent with Hodoyan's appearance. Miranda describes a number of other AFO activities in which Hodoyan participated, including the Gallardo murders. Miranda identifies the gun Hodoyan was carrying for his role in those murders. This provides further evidence of Hodoyan's involvement with the AFO.

As the district court concluded, the declarations signed by Cabrera and Cruz when they were represented by counsel, and the corroborating statements of Miranda and Soto, provide competent evidence to support the probable cause finding on the Ibarra murder charge as well as the criminal association charge. Although Cabrera, Cruz and Soto recanted their prior statements when they were arraigned on criminal charges that were partially based on their declarations, Cruz—clearly the individual with the most credible recital of torture—did not retract the substance of his earlier statements. He said only that he rejected the accusation of murder, which was "based principally [on] the statement of Francisco Cabrera Castro," in view of the fact that he did "not know any individual, much less of that name." However, even that does not refute his original statement, as that statement did not refer to Cabrera, but to "El Piedras." Thus, Cruz's declarations are at best only marginally discredited by the possibility of torture. Their credibility, and in turn that of the Cabrera and Soto statements, is buttressed by interlocking corroboration of Hodoyan's involvement as a killer who works for the AFO, and by Miranda's undiscredited testimony confirming the scenario for the Ibarra murder as Cabrera and Cruz reported it. We therefore agree with the district court that competent evidence supports the probable cause findings with respect to both charges on which Mexico is seeking Hodoyan's extradition. Accordingly, the magistrate did not clearly err in finding that probable cause exists to believe that Hodoyan was involved in the Ibarra killings, that the killings were motivated by Ibarra's threat to detain the Arellano Felix brothers, and that Hodoyan was an assassin for the AFO.

### E

Finally, to the extent Valdez and Hodoyan suggest that the evidence does not establish probable cause to believe that either is guilty of the crimes charged even if all the submissions are considered unchallenged, we disagree. As we have explained, Valdez's extradition is supported by unchallenged statements. And as we have concluded that competent evidence supports Hodoyan's ex-

---

**8.** As there is competent evidence to support the finding of probable cause apart from Cruz's statements that were recanted, we have no need to consider whether the magistrate judge abused his discretion in finding the signed declarations of Cruz more credible and reliable than his recantation.

tradition, it goes without saying that the declarations offered by Mexico in its case in chief suffice. In addition to the incriminating statements, the district court had before it hundreds of pages of investigative documents, ballistic reports, and witness statements. Far less has sufficed to uphold a probable cause determination. *See, e.g., Emami,* 834 F.2d at 1447 (upholding extraditability finding on the basis of a sworn affidavit of a German prosecutor containing fifty-two pages of summaries of statements made by former employees and patients of extraditee). The evidence here, while perhaps susceptible to attack at trial, is competent and sufficient to find that probable cause exists to believe that Valdez and Hodoyan are guilty of the crimes with which they are charged.

### III

■ Although they acknowledge that to date no court has ever denied extradition based on a fugitive's anticipated treatment in the requesting country, Valdez and Hodoyan note that we have recognized the possibility that a humanitarian exception might sometime apply, *Emami,* 834 F.2d at 1453, and they urge us to decline to extradite them since the evidence establishes that, upon return to Mexico, they will be tortured into making statements against others believed to be part of the AFO. The magistrate judge and the habeas court saw no basis for invoking any exception to the "rule of non-inquiry" that constrains courts in this country from examining the penal systems of the nation requesting extradition in the extradition hearing. Neither do we.

■ Under the rule of non-inquiry, "[a]n extraditing court will generally not inquire into the procedures or treatment which await a surrendered fugitive in the requesting country" because such determinations are to be made solely by the executive branch. *Arnbjornsdottir–Mendler,* 721 F.2d at 683. The Second Circuit first suggested the possibility of a humanitarian exception in *Gallina v. Fraser,* 278 F.2d 77, 79 (2d Cir.1960), in "situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination

of [the general principle upholding extradition]." We have occasionally repeated this caveat, *see Emami,* 834 F.2d at 1453; *Arnbjornsdottir–Mendler,* 721 F.2d at 683 (characterizing *Gallina*'s statement as dictum), but have never relied on it to create a humanitarian exception to extradition.

Assuming that the possibility exists in the abstract, this is not the sort of situation that concerned the court in *Gallina* or for which an exception might be justified. As the district court noted, Valdez and Hodoyan's claims that they will be mistreated by the Mexican authorities are speculative. General Rebello, the man accused by petitioners of carrying out the torture against the declarants in this case, is now under investigation by the Mexican authorities and apparently does not pose a threat to Valdez or Hodoyan. We have previously rejected claims of anticipated mistreatment such as theirs. *See, e.g., Emami,* 834 F.2d at 1453 (declining to recognize a humanitarian exception where the petitioner alleged that he would be detained in Germany for up to four years before being tried or released and that such treatment would cause him to suffer a serious heart attack). Therefore, in view of the facts of this case, the well-established rule of non-inquiry, and the scant authority for creating a humanitarian exception, we decline to overturn either extradition order on humanitarian grounds.

AFFIRMED.