UNITED STATES of America,
Plaintiff,

v.

Valentin LINSON, Defendant.

No. 99–00015.

United States District Court,
D. Guam.

March 15, 2000.

Office of the United States Attorney, by Mikel W. Schwab, Assistant U.S. Attorney, Hagatna, Guam, for plaintiff.

Office of the Federal Public Defender, by Robert E. Hartsock, Assistant Fed. Public Defender, Mongmong, Guam, for defendant.

## ORDER

UNPINGCO, District Judge.

This case comes before the Court on the United States' request on behalf of the Republic of the Philippines (Philippines) to have the defendant extradited to the Philippines where he is to be tried on the charge of murder.

**PROCEDURAL HISTORY:**

Pursuant to 18 U.S.C. Section 3184, the United States Attorney initiated extradition proceedings on August 20, 1999. Mr. Valentin Linson was arrested in Guam on August 27, 1999. He made his initial appearance in this Court on August 30, 1999. The Court then set a hearing date of October 27, 1999, and detained the defendant. On October 12, 1999, the Vice Consul in Manila reviewed the extradition request and supporting documents and properly certified them. On October 19, 1999, the Philippines formally filed a "Request for Extradition" with the United States State Department with the previously certified documents. At the October 27, 1999 extradition hearing the United States sought the extradition of the defendant to the Philippines where he would stand trial for the offense of Murder under Article 248 of the Revised Penal Code of the Philippines (Act No. 3815). In support of the extradi-

tion request, the U.S. offered the following previously certified Philippines documentary evidence:

1. Information, dated May 27, 1998 (charging the Defendant with the offense of Murder);

2. Order of Arrest dated June 22, 1998;

3. Death Certificate of Bienvenido Orenciano (the murder victim);

4. The Affidavit of Law of Senior State Prosecutor Hernani T. Barrios;

5. Sworn Statements of Pedro Sanchez, Roberto Calingasan and Soccorro de Agudon in Tagalog and English translations;

6. Post–Mortem Certificate;

7. Autopsy Report (Stating the cause of death was a gunshot wound to the head);

8. Cartographic Sketch dated 1/27/97;

9. Certifications from the National Bureau of Investigation (NBI);

10. Copies of pertinent Philippine laws;

11. Photograph of Valentin Linson.

The evidence, based mainly on the sworn statements, showed that Police Officer Bienvenido Orenciano had been shot by the defendant at a backyard birthday party in Maragondon, Cavite, Philippines. In her sworn statement dated 1/26/97 witness Agudon said that she "saw a tall, dark, thin man, wearing a brown polo and a hat stand and draw a gun and shot the left cheek of a man wearing a white T-shirt and white pants." Agudon further stated that she did not know the shooter's name but found out from the other people present that the shooter's name was "Val." Agudon also mentioned that if she were to see the man again she would be able to recognize him. A cartographic sketch of the shooter was prepared the next day based on Agudon's description of the shooter. Witness Pedro Sanchez stated in his affidavit that he "did not saw (sic) who gunned down PO3 Bienvenido Orenciano." Sanchez was proceeding to his house to get a knife when the shooting occurred.

The third witness' affidavit was allegedly made by Roberto Calingasan y Gonzales. Calingasan had been drinking at a table with four companions one of whom was the defendant. Officer Orenciano was drinking with two others at a separate table. Calingasan stated that: "I saw Valentin Linson stand up and took (sic) and raised (sic) a .45 caliber gun and said he wanted to kill somebody." Calingasan further stated that he "saw him (the defendant) shoot Bien, the policeman once."

At the October 27, 1999 extradition hearing the defense countered with affidavits from the witnesses Agudon and Calingasan recanting their earlier affidavits. In addition, the defense offered the affidavit of the victim's widow recanting her prior statement implicating the defendant.

In her recantation affidavit made on 7/2/98, witness Agudon stated that "the truth was, I did not see what happened and I don't know who shot Bienvenido Orenciano. That the reason ... said ... before that I saw what happened ... was because Elvie Orenciano, his sister have (sic) talked to me to tell such because they can't get a witness."

Witness Calingasan in his undated August 1998 recantation affidavit stated that:

"2. That what was written in the Statement to the NBI is not true;

3. That I did not sign a Statement at NBI."

The victims' widow, Clarita Orenciano in her 7/23/98 affidavit stated that:

"2. That I give (sic) a sworn statement on January 27, 1997 to the National Bureau of Investigation.

3. That I stated (sic) in my statement that it was Valentin Linson who shot my husband.

4. That after I have (sic) given my Sworn Statement, I did my own investigation, and I found out it was not Valentin Linson who murdered my husband, but another person who was not known by those who were present at the scene of the incedent (sic);

5. That even if I have said it in my sworn statement that it was Valentin Lin-

son who killed my husband, that it is not of my personal knowledge but it was only what was said to me by my sister-in-law, Benilda Orenciano.

6. That my sister-in-law was not at the place where it happened;

7. That after thinking of all that happened, I thought it would be best to retract my sworn statement given to the NBI so that the person who has not committed the sin will not suffer;"

The Court in the case at bar had not been furnished with Mrs. Orenciano's original affidavit to the NBI.

All of the recantation affidavits were witnessed by defendant's attorney in the Philippines, Mr. Raymundo Beltran, and the "Government Prosecutor assigned to the ... case ... Ernesto Vida" according to an affidavit filed by Mr. Beltran. Mr. Beltran also stated that:

> ... Assistant Prosecutor investigated also why these witnesses executed their respective Affidavits and after these witnesses explained to him that they executed their respective Affidavits, freely and voluntarily, because there is no truth to their earlier statements that they saw the accused Valentin Linson shot the late Bienvenido Orenciano, the Assistant Prosecutor administered the oaths attesting to the fact that the witnesses freely and voluntarily signed their respective Affidavits of Recantation."

The Court continued the extradition hearing until December 21, 1999 so that the U.S. could obtain further information necessary to respond to queries posed by the Court. Specifically, the Court inquired:

(1) Why the recantations were not initially given to the Court by the Philippines;

(2) Why was the assistant prosecutor who witnessed the recantations not con-

tacted to determine whether his signature on the affidavits were authentic; and,

(3) How much weight is given to recantations in the Philippine courts? [1]

At the December 21, 1999 hearing the Philippines did not proffer any evidence to the Court challenging the authenticity of the recantations. Instead, the Philippines offered explanations showing why they could not proffer the recantation evidence. First, their state prosecutor who witnessed the recantations had no telephone and could not be reached. Second, the Senior prosecutor, Mr. Barrios stated that the recantations were never forwarded to him. At the end of the hearing, the matter was taken under advisement by the Court.

The sole issue in dispute in this case is whether the Philippines has furnished evidence amounting to probable cause that the defendant, Valentin Linson, committed the alleged offense of murder. By stipulation dated December 3, 1999 and filed on December 6, 1999, both parties in the case at bar have stipulated that all the other factors necessary for an extradition mandated by the Extradition Treaty between the U.S. and the Philippines have been met.

**LAW AND ANALYSIS:**

■ The United States extradition process and procedure is set forth in 18 U.S.C. Sections 3181–3195. Under this statutory scheme, the district judge conducts a hearing in which the Government must establish the following jurisdictional and legal elements: (1) the Court has jurisdiction over the subject matter and individual; (2) the crime charged is an extraditable offense under the treaty; (3) that there is probable cause that the detainee committed the alleged offense; and (4) the detainee has not shown by a preponderance of the evidence a valid defense to the extradition. 18 U.S.C. § 3184; See also *Hooker v. Klein*, 573 F.2d 1360, 1367 (9th

---

1. If no weight is normally given by the Philippine courts then it would be understandable why the recantations were not included in the documents originally furnished by the Philippines.

Cir.1978), cert. denied, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978). If based on the evidence presented in the extradition hearing the government establishes these factors then the Court may certify a detainee's extraditability. As both sides have stipulated to all elements, except for probable cause, further discussion of these elements is unnecessary.

■ Normally, during an extradition hearing a magistrate need only "determine whether there is 'any' evidence sufficient to establish probable cause" that the fugitive committed the offense charged. *United States ex rel. Sakaguchi v. Kaulukukui*, 520 F.2d 726, 730–731 (9th Cir.1975) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925)). This limited standard has been held to be analogous to a magistrate's role, under United States law, in determining whether or not to hold a defendant to answer to a charged offense. *Emami v. United States District Court for Northern District of California*, 834 F.2d 1444, 1447 (9th Cir. 1987).

■ And, a fugitive's grounds for opposition to an extradition request are severely circumscribed. *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir.), *cert. denied*, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978). He may not introduce evidence which conflicts with the evidence submitted on behalf of the demanding state, *Collins v. Loisel*, 259 U.S. 309, 315–17, 42 S.Ct. 469, 66 L.Ed. 956 (1922); establishes an alibi, *Abu Eain v. Adams*, 529 F.Supp. 685 (N.D.Ill.); sets up an insanity defense, *Hooker v. Klein;* or impeaches the credibility of the demanding countries witnesses, *In re Locatelli*, 468 F.Supp. 568 (S.D.N.Y.1979). He is limited to introducing explanatory evidence.

■ But, the Ninth Circuit in *Mainero v. Gregg*, 164 F.3d 1199, 1207, n. 7, stated that "We have never determined the issue of whether recantation evidence is admissible in an extradition hearing." In *Mainero*, the Magistrate judge considered the proffered recantation evidence. Generally, evidence that explains away *or completely obliterates probable cause* (emphasis added) is the only evidence admissible at an extradition hearing, whereas the evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible. See *Charlton v. Kelly*, 229 U.S. 447, 457–58, 33 S.Ct. 945, 57 L.Ed. 1274 (1913). Courts have split on whether recantation evidence is admissible under this rule. Compare *Eain v. Wilkes*, 641 F.2d 504, 511–12 (7th Cir.1981), holding that the magistrate judge did not err in refusing to admit recanting statements because they constituted contradictory evidence, with *In the Matter of Extradition of Contreras*, 800 F.Supp. 1462, 1464, 1469 (S.D.Texas 1992), admitting recantation testimony because if the only evidence of probable cause were confessions that were sufficiently recanted, the existence of probable cause would be negated. Following the lead of *Mainero* and *Contreras*, this Court holds that the recantations in the case at bar will be considered. This Court finds that the recantations are not just contradictory evidence but evidence that completely obliterates probable cause. Limiting the Court's consideration merely to a determination whether the *Sakaguchi, supra*, standard is met would be a grave injustice in this case.

The Court believes the evidence presented was insufficient to satisfy the standard for probable cause for the following reasons. First, the description of the alleged murderer and the cartographic sketch dated January 27, 1997 drawn as described by Socorro Agudon was:

Age: 45–55; Height: 5′6″ – 5′8″; Weight 120 – 130 pounds.

Valentin Linson has appeared before this Court on three separate occasions. His facial features (especially his nose and lips) do not match the sketch. Moreover, Mr. Linson definitely does not match the description given by Agudon. He is sixty years old (60), six feet tall (6′0), and weighs over 175 pounds.

Next, the original Affidavit of Socorro de Agudon states "I saw a tall, dark, thin

man, wearing a brown polo and a hat stand and draw a gun and shot the left cheek of a man wearing a white T-shirt and white pants ... I do not know him ... [b]ut according to other people who were present there his name is Val." The Defense submitted a later affidavit of Socorro de Agudon recanting the statement made to the NBI in 1997. In that statement Agudon states that "in my statement I have stated that I know who shot Bienvenido Orenciano, and I have said that he was Val ... I also said in my statement that I saw the whole incident ... the truth was, I did not see what happened and I don't know who shot Bienvenido Orenciano." Furthermore, Agudon states that "the reason why I said such before, that I saw what happened and I knew who shot Bienvenido Orenciano, was Elvie Orenciano his sister have talked to me to tell such because they can't get a witness." Clearly, Agudon could not have accurately described the shooter for the cartographic sketch since admittedly she did not see the shooter if the recantation is to be taken at face value.

Third, the Philippine Government presented an affidavit in which Roberto Calingasan implicated Linson stating "I saw him (Valentin Linson) shoot Bien, the policeman once." However, defendant has supplied the Court with an affidavit signed by Calingasan in which he denies he signed such statement for the NBI. In the affidavit presented by the defendant Calingasan states that "I did not give NBI a statement ... what was written in the statement was not true" and "I did not sign a statement at NBI." This second statement is signed in a cursive style signature whereas the first one provided by the Philippines only had Calingasan's name printed in block letters on the signature space.

As the only other eyewitness Agudon had recanted her testimony that she had seen Linson shoot Orenciano, the importance of Calingasan's testimony was increased by several orders of magnitude. Yet, the Philippine Government submitted nothing contravening or explaining Calingasan's subsequent statement.

Fourth, the affidavit of Pedro Sanchez states that he did not see the person who shot the victim. Sanchez states that "I am going at our house to get a knife ... I heard two consecutive gun shot and when I turned back from the scene of where the loud bang came from, I saw many people running. ... so I also run and hide at our toilet." Sanchez's statement does not aid in the establishment of probable cause.

Finally, the defendant provided the Court with an affidavit from Clarita Orenciano, the widow of the victim, recanting her prior statement implicating Valentin Linson. Although the United States never provided the Court with the widow's statement implicating Linson, in her recantation she states that "I gave a sworn statement on January 27, 1997 to the National Bureau of Investigation ... I stated ... that it was Valentin Linson who shot my husband." Furthermore, she stated "that even if I have said in my sworn statement that it was Valentin Linson who killed my husband, it was not of my personal knowledge but it was only what was said to me by my sister-in-law, Benilda Orenciano."

The United States now urges this Court to disbelieve all these recantations. Moreover, they provide no statement from the Assistant Prosecutor of Naic, Cavite who signed each of the affidavits, supplied by defendant, that the signature on these affidavits is not his or that the signature of each witness is not genuine. Nor, is any additional information or explanation as to the substance of Defense Counsel Beltran's affidavit offered (copy attached); such as whether the Assistant Prosecutor investigated why these witnesses recanted and what he may have found.

The United States asserts that these issues should be resolved in the Philippine courts. According to the affidavit of Philippine Senior Prosecutor Barrios "recanted testimony is exceedingly unreliable for there is always the probability that it may later be repudiated." Philippine courts "thus look with disfavor at affidavits of recantations of testimony." This, however,

does not mean that a U.S. District Court should not consider recantation evidence in an extradition hearing. In making probable cause determinations courts do weigh all the evidence presented to it. The District Court's function in an extradition hearing is not to act as a rubber stamp to an extradition request but to ensure that our judicial standard of probable cause is met by the Requesting Nation. Moreover, it is quite clear that the Philippine Government has a responsibility under the Extradition Treaty to supply evidence of probable cause to this Court prior to this Court approving the extradition request. Extradition Treaty with the Philippines, Nov. 13, 1994, U.S. – Philippines, art. VII para. 3, U.S. Treaty Doc. 104–16. Based on the information available to this Court, it appears that the Philippine Government had these recantations prior to seeking a warrant but did not include the recanted statements along with the original witness statements.

The Court must look at all the evidence in deciding the issue of probable cause. However, when broken down there are five pieces of evidence which together could establish probable cause; the three affidavits of the witnesses, the photograph of Mr. Linson and the cartographic sketch made by the NBI. The Court has already held that the recantations are admissible and completely obliterate probable cause. But, putting this aside, the other evidence should be discussed.

The cartographic sketch does not look like Mr. Linson. Moreover, the witness who gave the description to the sketch artist, Soccorro de Agudon, in her recantation admitted she never saw the shooter. This leaves only the photograph of the Defendant.

The Court has seen the defendant three times. Based on the time that has elapsed since the shooting, and physical changes that occur to people (such as weight gain, change of complexion due to exposure to the sun and personal grooming) it is hard to say whether the Defendant definitely matches the photograph. Also, the date of the photo is unknown.

The Court in this case also cannot totally ignore the Defense's assertion that the conditions in Philippine jails can be oppressive. The Defense asserts that it often takes years before people are brought to trial and that defendants awaiting trial are sometimes murdered in prison. Defendant asserts that he is most fearful of being returned to the Philippines as he thinks he will be killed in jail, a fate that befell one of his close relatives.

After careful review of the evidence, the Court DENIES the Philippine Government's request. Considering the probable cause threshold that needs to be satisfied and the totality of the evidence presented, the Court holds that the Philippine government failed to provide the United States and the Court with sufficient evidence which would establish probable cause to charge Valentin Linson with the crime of Murder.

**IT IS SO ORDERED.**

**IT IS FURTHER ORDERED** that Valentin Linson is to be released from custody immediately.