**Kulvir Singh BARAPIND, Petitioner–Appellant,**

v.

**Jerry J. ENOMOTO, United States Marshal for the Eastern District of California, Respondent–Appellee.**

**No. 02–16944.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 2003.

Filed March 10, 2004.

Jagdip Singh Sekhon, Law Offices of Sekhon & Sekhon, San Francisco, CA, for the petitioner-appellant.

Richard Beltran Curtis, Amicus Curiae, The Sikh Coalition, Inc., Washington, DC, for the petitioner-appellant.

James F. Smith, Amicus Curiae, King Hall Immigrant Detention Project, Davis, CA, for the petitioner-appellant.

Cynthia S. Hahn, Federal Public Defender, Fresno, CA, for the respondent-appellee.

Stanley A. Boone, Assistant United States Attorney, Fresno, CA, for the respondent-appellee.

Before: FARRIS, TROTT, Circuit Judges, and WEINER,* Senior Judge.

TROTT, Circuit Judge.

# I

## OVERVIEW

 India requests the extradition of Kulvir Singh Barapind ("Barapind") in order to try him for crimes arising out of eleven (11) separate incidents in 1991 and 1992, specifically the crimes of murder, attempted murder, and robbery. The United States District Court for the Eastern District of California certified the request and approved Barapind's extradition with respect to crimes tied to only three of the eleven incidents.[1] The court determined that supporting probable cause had not been established for allegations regarding three of the other incidents, and that the "political offense" exception, artic-

ulated in Article VI of the relevant treaty, barred extradition on the remaining five.

Barapind challenged the court's decision to surrender him to India by petitioning for a writ of habeas corpus. His petition, which was heard by the same judge, attacked the probity, reliability, and competence of the evidence relied upon by the court to find probable cause to extradite, and it raised the "political offense" doctrine as a legal bar to the requisition for his surrender on the charges on which he was found extraditable. Barapind now appeals the district court's denial of his petition. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. §§ 1291 and 2253(a), and we affirm.

# II

## FACTUAL BACKGROUND

For a complete recitation of the facts, see *In re Extradition of Singh,* 170 F.Supp.2d 982 (E.D.Cal.2001). The facts set forth below are only those pertinent to this appeal.

### A. Historical Background

This extradition arises out of a series of connected events that occurred in the Indian State of Punjab from the mid–1980s to early 1990s, where Sikh insurgents sought to establish a new homeland within that state to be called Khalistan. The existing tensions caused by this movement in the Punjab between Sikh nationalists and the Indian Government erupted in June 1984, when Indian armed forces launched "Operation Bluestar" to capture and oust Sikh rebels who had taken refuge in the Golden Temple, the holiest of Sikh shrines. This military strike resulted in extensive dam-

---

* Hon. Charles R. Weiner, Senior District Judge for Eastern Pennsylvania, sitting by designation.

1. The ultimate decision of whether to surrender a fugitive to a requesting government rests exclusively with the Secretary of State. 18 U.S.C. § 3186 (2003).

age to the temple complex, the killing of at least 500 persons, and numerous casualties among civilians who were caught in the crossfire. The incident came to be known as the "Golden Temple Massacre" and was a focal point for Sikh militancy.

In October 1984, in an apparent attempt to avenge the massacre, two Sikh body-guards assassinated Indira Ghandi, the Prime Minister of India. A decade of intense strife followed. Sikh militants, in pursuit of their goal of creating a new homeland, engaged in bombings, assassinations, and other terrorist activities against the Indian Government, its local collaborators, and innocent civilians. The Government of India responded with extensive counterinsurgency efforts, but it was not until 1994 that the active armed Sikh separatist insurgency was largely contained. It is estimated that during this decade, 30,000 to 100,000 people were killed in this confrontation.

### B. Kulvir Singh Barapind

In 1985, Barapind, while a college student in Jalandhar, Punjab, India, became an active member of the All India Sikh Student Federation ("Federation"), a group committed to establishing the sovereign Sikh nation of Khalistan. Barapind subsequently moved up the group's hierarchy, becoming president of the Federation for the District of Jalandhar, Punjab in 1988. Despite personal harassment by the police and the killing of fellow Federation members, Barapind continued his protest activities. According to Dr. Cynthia Mahmood, an expert on international violence and terrorism, Barapind became a folk hero who has great popular support among Sikh Separatists.

### C. Criminal Process in India

As summarized by the appellee, the initial phases of criminal process in India bear many similarities to our own. When a crime is committed, a First Information Report, or "FIR," is prepared by the Head Constable or other authorized officer in the police station having territorial jurisdiction over the offense. The FIR sets forth the facts regarding the case and the specific violation of the Indian Penal Code and other statutes. FIRs are prepared only for serious crimes like murder, attempted murder and conspiracy to commit murder. After they are prepared, an investigation is conducted by officers of the police station. In the case of serious crimes, when sufficient evidence has been gathered to form a reasonable basis to believe a crime has been committed by the accused, a document known as a "challan" is prepared by the station house officer.

Challans are then presented to the district attorney, whose duty is to review them and to ascertain whether there is sufficient evidence to obtain a judicial verdict against the accused. The qualifying challans are then filed with the Judicial Magistrate Courts in the sub district responsible for the police station where each case was initiated and investigated. This filing is accomplished by the prosecuting agencies who, in accordance with Indian law and other relevant provisions of the Criminal Procedure Code, submit the complete case files to the judicial magistrate for trial.

The challans supporting the case against Barapind and prepared according to this process were presented to the prosecuting agency, the District Attorney of Jalandhar District, State of Punjab. The District Attorney reviewed the challans to ascertain the sufficiency of the included evidence to obtain a judicial verdict against the accused. District Attorney of Jalandhar S.K. Kapoor made a sufficiency finding for every challan asserting charges against Barapind.

After the District Attorney certified the challans, the cases were filed with Judicial Magistrate Courts in the sub districts of Jalandhar. The filing was completed for Barapind's trial when the District Attorney submitted the case files to Judicial Magistrates in accordance with section 173 of the Indian Criminal Procedure Code. The judicial magistrate issued arrest warrants for Barapind for all of the crimes that predicate the extradition request. This request for extradition followed in due course.

### D. Affidavit of Satish Kumar Sharma

At all times relevant, Satish Sharma was the Police Chief for the District of Jalandhar, Punjab. He was the ranking police official and was personally responsible for the investigation of all criminal cases in that district, including the case against Barapind. His duties included supervising the investigations conducted by officers under his command; reading reports of investigating officers; and personally reviewing the investigation reports and statements regarding the cases against Barapind that are the subject of the extradition request. Each criminal charge against Barapind is documented by an FIR, which identifies the substantive violation of the Indian Penal Code, the applicable provisions of the Terrorist and Disruptive Activities (Prevention) Act (TADA), and, in certain cases, the Arms Act. No extradition is sought for violations of TADA or the India Arms Act.

Satish Sharma alleges that Barapind is a fugitive from justice, that he could not be tried in his absence, and that the Judicial Magistrate declared Barapind a "proclaimed offender," as set forth in Section 82 of the Indian Criminal Procedure Code for each of the charges in the FIRs.

## III

## PROCEDURAL BACKGROUND

Barapind arrived in the United States at the Los Angeles International Airport on April 25, 1993, under a passport bearing the false name, Mahim Mehra. An alert INS officer immediately detained Barapind and charged him as an excludable alien under the Immigration & Nationality Act (INA). See 8 U.S.C. §§ 1101 et seq. (2003). Barapind conceded he was excludable under the INA, but on June 7, 1993, he applied for asylum and withholding of deportation based on his alleged fear he would be persecuted upon his return to India on account of his Sikh political separatist activities. The Immigration Judge (IJ) denied Barapind's application, and ordered him excluded. The BIA affirmed the exclusion order.

On August 3, 1994, Barapind filed a first habeas petition pursuant to § 106(a)(10) of the Immigration and Naturalization Act, 8 U.S.C. § 1105a(a)(10) (1994), challenging the BIA's exclusion order in the United States District Court for the Central District of California. Because of legal error, the district court remanded Barapind's case to the BIA. Barapind appealed the order of remand to this Court. In an unpublished decision, we affirmed. The district court complied with our decision by issuing a modified remand order on July 17, 1997, directing the BIA to readjudicate Barapind's asylum application.

On September 18, 1997, after Barapind was transferred to a detention facility in Bakersfield, California, India filed, in the U.S. District Court for the Eastern District of California, the intervening complaint for extradition at issue in this case. India sought extradition under the Treaty for the Mutual Extradition of Criminals between the United States of America and Great Britain ("Extradition Treaty"), Dec.

22, 1931, U.S.-Gr. Brit., T.S. No. 849 (1932), made applicable to India from March 9, 1942, in accordance with Article 14.

On October 30, 1997, despite Barapind's objection, the BIA granted an INS motion to hold in abeyance the asylum and exclusion proceedings, pending the outcome of the extradition proceedings. Barapind then filed a second habeas corpus petition in the Central District of California, challenging the BIA's stay of the immigration proceedings and seeking declaratory relief to compel the BIA to adjudicate his asylum application first and to enjoin the defendants from extraditing him to India, or in any other way interfering with his right to a final adjudication of his asylum application. On February 27, 1998, Barapind's second habeas petition was transferred to the Eastern District of California, where he was in custody.

On June 4, 1999, on the INS's motion, the district court dismissed Barapind's second habeas petition for lack of subject matter jurisdiction and failure to state a claim as a second, successive petition, and for failure to demonstrate legal justification to stay the extradition proceedings. *Barapind v. Reno,* 72 F.Supp.2d 1132, 1144–47 (E.D.Cal.1999) *aff'd on other grounds,* 225 F.3d 1100 (9th Cir.2000). On August 28, 2000, we affirmed dismissal without prejudice on a different ground, and held that the BIA was authorized to hold exclusion/asylum proceedings in abeyance pending completion of the extradition. *Barapind v. Reno,* 225 F.3d 1100, 1114 (9th Cir.2000).

Following six days of evidentiary hearings and legal arguments conducted during February and March, 2001, the district court, sitting pursuant to 18 U.S.C. § 3184, issued a detailed, thorough, and thoughtful Memorandum Decision and Order Re Extradition. The court concluded that Bara-

pind was extraditable for the offenses of 1) the murder of Kulwant Kaur as charged in FIR 89; 2) the murders of Kulwant Singh, Aman Nath Kanigo, Soda Ram, and Jasbir Ram as charged in FIR 34; and 3) the murder of Sahib Singh (a.k.a. Sahbi) and the attempted murder of Makhan Ram as charged in FIR 100.

As to five of the remaining charges, the district court concluded that although probable cause to extradite existed, extradition was barred by the Treaty itself because they fell within its "political offense" exception. With respect to three of the remaining six charges, the district court concluded that reliable and probative evidence—submitted by Barapind in the form of declarations, affidavits, and sworn courtroom testimony—"obliterated" India's showing of probable cause. To demonstrate why the witnesses would alter and recant their original statements to the authorities, Barapind had submitted evidence that Indian police and their agents resorted to torture, coercion, abuse of process, and extrajudicial detentions to obtain evidence against militant Sikhs in order to suppress their separatist movement. The court accepted this evidence as competent. India, represented by the United States Department of Justice, put forth minimal effort to refute this evidence, and has not challenged the district court's adverse findings and conclusions.

On September 18, 2001, the court issued a certification and order of extraditability, certifying petitioner's limited surrender to India and committing petitioner to custody, where he remains today.

On that same day, Barapind filed yet another petition for writ of habeas corpus challenging the certification of his extradition to India. The district court held a hearing on Barapind's claims and ultimately denied this petition, upholding the extradition decision as it pertained to both

the probable cause determinations and the applicability of the political offense exception. This appeal follows.

# IV

## PROBABLE CAUSE

### A. Standard of Review

 Our inquiry in reviewing the denial of a district court's rejection of a petition for a writ of habeas corpus, taken from an extradition judge's certification of extraditability, "is more restricted than that afforded in a direct appeal." *Caplan v. Vokes,* 649 F.2d 1336, 1340 (9th Cir. 1981). Our inquiry is limited to whether:

1. the extradition judge had jurisdiction to conduct proceedings;

2. the extradition court had jurisdiction over the fugitive;

3. the extradition treaty was in full force and effect;

4. the crime fell within the terms of the treaty; and

5. there was competent legal evidence to support a finding of extraditability.

*Zanazanian v. United States,* 729 F.2d 624, 626 (9th Cir.1984) (citing *Caplan,* 649 F.2d at 1340). Parts 1–4 of this test are reviewed de novo. But part five, the existence of competent evidence establishing probable cause, is a unique creature because the magistrate does not weigh the evidence and resolve factual disputes; it simply decides whether the evidence provides reasonable grounds to believe the fugitive is guilty of the crimes alleged. The magistrate's ruling is therefore not a pure finding of fact in the traditional sense, but a mere identification of the evidence, including admissible recantations, upon which the extradition decision is based. Therefore, we uphold an extradition judge's determination of probable cause if "there is any competent evidence

in the record to support it." *Quinn,* 783 F.2d at 791 (citing *Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925); *Zanazanian,* 729 F.2d at 626); *see also Mainero v. Gregg,* 164 F.3d 1199, 1206 (9th Cir.1999). As Justice Holmes said in *Fernandez,* a petition for a writ of habeas corpus in an extradition case "is not a means for rehearing what the magistrate already has decided." 268 U.S. at 312, 45 S.Ct. 541.

### B. Admissibility and Competency of Evidence

 Barapind contends that the district court, sitting as an extradition court, improperly found that the Government of India had satisfied its burden of establishing probable cause of Barapind's guilt of the underlying offenses. He attacks India's evidence as generally incompetent, unreliable, recanted, unpersuasive, and, in many instances, the product of untrustworthy police behavior. The evidence presented by India in order to establish probable cause consisted entirely of eyewitness statements identifying Barapind as the perpetrator of the alleged crimes. These statements were summarized by Satish Kumar Sharma, and accompanied by a sworn affidavit attesting to the veracity of the English translations. Although this body of evidence is rife with hearsay, "unsworn statements of absent witnesses may be acted upon by the committing magistrate, although they could not have been received by him under the law of the State on a preliminary examination." *Collins v. Loisel,* 259 U.S. 309, 317, 42 S.Ct. 469, 66 L.Ed. 956 (1922). We have explicitly held that an extradition request may be based entirely on an investigator's affidavit summarizing other witnesses' hearsay statements and information. *Emami v. U.S. Dist. Ct.,* 834 F.2d 1444, 1451 (9th Cir. 1987).

██ Under general United States extradition law, the only requirement for competency and admissibility is that the evidence be properly authenticated. *Id.* at 1451; *Oen Yin–Choy v. Robinson*, 858 F.2d 1400, 1405 (9th Cir.1988) (finding ten translated and unsworn witness statements to be reliable and competent on the basis of the authentication). 18 U.S.C. § 3190, which governs the admissibility of evidence in extradition cases, specifies that "the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that [the documents submitted into evidence] are authenticated in the manner required." 18 U.S.C. § 3190. The Extradition Treaty specifies nothing more than that the extradition be carried out "in conformity with the laws regulating extradition...." Extradition Treaty, art. 8, T.S. No. 849. Therefore, in this case the certification signed by Matthew P. Daley, Charge d'Affaires ad interim of the United States at New Delhi, on November 22, 1994, and the certification attached to the supplemental affidavit, signed by Consul General Wayne S. Leininger on June 12, 1998, were sufficient to satisfy the competency and admissibility requirement of 18 U.S.C. § 3190.

In an effort to undermine the weight of the eyewitness statements, with respect to FIRs 89, 34 and 100, Barapind offered his own compelling witness statements, in which all of the eyewitnesses upon which India relies either recant their earlier identification, or deny having made an identification in the first place. There is some confusion, however, as to whether this type of evidence is admissible in this context. The general rule is that evidence that "explains away or completely obliterates" probable cause is admissible, while evidence that "merely controverts the existence of probable cause" is not. *Mainero v. Gregg*, 164 F.3d 1199, 1207 n. 7 (9th

Cir.1999). Courts, however, have struggled with the admissibility of recantation evidence under this rule. *See, e.g., In re Extradition of Singh*, 170 F.Supp.2d at 994 (recognizing that "the standard is extremely difficult to apply"); *compare Eain v. Wilkes*, 641 F.2d 504, 511–512 (7th Cir. 1981) (rejecting recanting statements as merely contradictory) *with In re Extradition of Contreras*, 800 F.Supp. 1462, 1469 (S.D.Tex.1992) (determining that confessions were sufficiently recanted to negate probable cause). Although we have never directly confirmed the admissibility of recantation evidence, it is not necessary that we resolve this issue today because the extradition judge considered and weighed Barapind's proffered recantation evidence in conformity with the rule expressed in *Mainero*, 164 F.3d at 1207 n. 7.

## C. Sufficiency/Reliability of the Evidence: FIRs 89, 34 and 100

Article 9 of the Treaty provides: "[t]he extradition shall take place only if the evidence be found sufficient ... to justify the committal of the prisoner for trial." Treaty, *supra* p. 1 at art. IX. As discussed in the judge's extradition order, this language provides a probable cause standard "identical to that used by courts in federal criminal preliminary hearings." *In re Extradition of Singh*, 170 F.Supp.2d at 993 (quoting *Sidali v. I.N.S.*, 107 F.3d 191, 199 (3d Cir.1997)); *see also Charlton v. Kelly*, 229 U.S. 447, 461, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *Mirchandani v. United States*, 836 F.2d 1223, 1226 (9th Cir.1988). To satisfy this standard, the government requesting extradition has the burden of producing evidence sufficient to give the magistrate "reasonable ground to believe the accused was guilty." *Quinn*, 783 F.2d at 790 (quoting *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925)). If there is "any competent evi-

dence" in the record to support the finding of probable cause, the extradition order must be upheld. *Id.* at 791.

Although the magistrate recognized that the evidence India presented, "may be insufficient [at trial] to meet the evidentiary burden of proof beyond a reasonable doubt," he correctly recognized that this is "not a trial on the merits," and that "uncorroborated witness statements can by themselves establish probable cause." *In re Extradition of Singh,* 170 F.Supp.2d at 1015–16 (citing *Bozilov v. Seifert,* 983 F.2d 140, 143 (9th Cir.1992)); *Fernandez,* 268 U.S. at 312, 45 S.Ct. 541 ("Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict."); *Zanazanian,* 729 F.2d at 626–27. But for Barapind's "substantial contradictory, conflicting, and in some instances totally inconsistent evidence," as well as evidence that India's police force engaged in fabrication of evidence, torture, and coercion, the competence and effect of India's evidence would not be in doubt. *In re Extradition of Singh,* 170 F.Supp.2d at 1016. In order to resolve this conflict, and to determine whether probable cause existed to extradite Barapind, or whether it had been obliterated, the magistrate meticulously analyzed each FIR. There is ample competent evidence in the record to support the magistrate's judicious probable cause determinations.

### 1. FIR 89: The Murder of Kulwant Kaur

■ On September 6, 1992, Sohan Singh was asleep on the roof of his private residence along with his wife Gurmail Kaur and sons Paramjit Singh and Kashmir Singh. His third son, Karamjit Singh and his wife, Kulwant Kaur, were sleeping in a room in the house. All three of Sohan Singh's sons were considered to be "pro-police," and as a result had been issued arms and ammunition by the police for "self-defense." Around 2:00 a.m., four persons, one of whom Sohan Singh identified as Barapind, came on to the roof of the residence. Sohan Singh observed his son, Kashmir, attempt to chamber a round in his rifle. At that point Barapind shot Kashmir Singh with an AK–47, killing him. Barapind then shot Paramjit Singh to death in the presence of Sohan Singh and his wife, Gurmail Kaur. The assailants asked Gurmail Kaur the whereabouts of her third son, Karamjit Singh. Gurmail Kaur, out of fear, told the assailants Karamjit Singh was sleeping in another room. Barapind stayed on the roof and the three other assailants went downstairs to Karamjit Singh's room, broke open the door, and shot to death Karamjit Singh and his wife Kulwant Kaur. Before leaving, the four assailants took the arms and ammunition of the three victims. Sohan Singh, who was not wounded or killed, gave physical descriptions of the assailants and stated that an electric light bulb was on during the shooting which aided his and his wife's identification of Barapind. Sohan could not identify the other three assailants, who Sohan stated went downstairs and shot Karamjit and his wife Kulwant. Sohan did not sign his original statement, but rather is said to have affixed his thumbprint on it. No thumbprinted statement was submitted with the request, however, Sohan Singh identified Barapind by affixing his thumb print on the reverse side of a picture of Barapind, which is in the record.

Although the court ultimately determined that the murder of the three brothers was a political offense, it certified extradition as to the murder of Kulwant Kaur, the wife of Karamjit Singh because there was no evidence that she was a police collaborator. The court found that unlike the other victims, she was "an innocent civilian" who had been murdered, and that probable cause existed to believe Bar-

apind to be a "co-perpetrator." *In re Extradition of Singh,* 170 F.Supp.2d at 1023–24.

Barapind does not contest the facts as related by Sohan Singh, but he contends that the evidence presented fails to establish a prima facie case of the murder of Kulwant Kaur. Barapind claims that in order to be found guilty of a murder in which he did not pull the trigger, there would need to be a showing that he had culpable intent. He argues that such evidence is lacking. He is correct, in that under Indian Penal Code § 108, Barapind would be guilty of murder only if he had "the same intention or knowledge" as the person who actually pulled the trigger. India Pen.Code § 108. Barapind, however, fails to recognize, "[t]he function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether evidence is sufficient to justify a conviction." *Collins v. Loisel,* 259 U.S. 309, 316, 42 S.Ct. 469, 66 L.Ed. 956. The evidence offered by Barapind might raise an evidentiary defense to the charges; however, it does not affect the probable cause determination, and thus the magistrate properly declared Barapind extraditable as a co-perpetrator of the murder charged in F.I.R. 89. A fair inference from the evidence in this context is that Barapind shared the criminal intent of his confederates.

### 2. FIR 34: The Murders of Balwant Singh Sarhal, Amar Nath Kanugo, Suda Ram, and Jasbir Singh

The events underlying F.I.R. 34 were recounted by Nirmal Singh to officer Surinder Pal while on patrol on April 26, 1992. Nirmal approached officer Pal and told him that he saw Balwant Singh Sarhal, an ex-Member of the Legislative Assembly along with Amar Nath Kanugo of the Deputy Commissioner Office, Jalandhar, and two armed constables come from the side of Village Garhi Mohan Singh in a "gypsy vehicle," which was driven by Balwant Singh Sarhal. Officer Pal states that Nirmal Singh reported that Barapind and two other men opened fire on the vehicle and shot and killed Balwant Singh Sarhal and the three other occupants of the vehicle. The four assailants took Bulwant Singh's bodyguard's weapons, and went towards the village of Dhandwar.

Contrary to this version of the facts, Barapind submitted an additional affidavit of Nirmal Singh, drafted in 2001. Nirmal admits that he witnessed the shooting, but he denies identifying any of the assailants for the police.

Although the magistrate acknowledged that, without a trial-like proceeding, one could not accurately make a credibility determination regarding Nirmal's two conflicting bare affidavits that directly contradict one another, he ultimately determined that probable cause had not been obliterated or explained away.

"Inherent in the probable cause standard is the necessity of a determination that the evidence is both sufficiently reliable and of sufficient weight to warrant the conclusion." *United States v. Lui Kin–Hong,* 110 F.3d 103, 120 (1st Cir. 1997). Barapind argues that the magistrate's inability to make a credibility determination indicates that the judge did not make an affirmative finding as to the competence of the evidence, and thus the probable cause determination was not adequately supported. Although the judge stated that the competence of India's evidence cannot be determined without a trial, the conclusion that probable cause has not been defeated necessarily implies that he made a decision as to the weight of the evidence. As would be the case in many preliminary hearings, the evidence pre-

sented revealed conflicts regarding motive, bias, and credibility of the witnesses that will not be resolved until trial. However, the inability of the judge to make a credibility determination on a written record does not mean that the low threshold for ordering a trial has not been satisfied. Although the contradictory affidavits offered by Barapind might ultimately create doubt as to the veracity of the evidence, they were not sufficient in this context to explain away or obliterate India's evidence. Barapind failed to satisfy this daunting standard, and thus the court correctly concluded that "probable cause was not defeated under these circumstances." *Id.* at 1025. Given that the weight to be accorded the witness statements is within the sole discretion of the magistrate, we cannot say that he lacked any evidence upon which to support his decision.

### 3. FIR 100: The Murder of Sahib Singh and the Attempted Murder of Makhan Ram

The events alleged in F.I.R. 100 took place after Makhan Ram went to visit his sister on October 26, 1991. At 6:45 p.m., he left with Sahab Singh, a.k.a. Sahbi, to go to Sahab Singh's house. At 7:15 p.m., they were about to cross railway tracks when they encountered two individuals on a scooter. Makhan Ram identified the driver of the scooter as Barapind, and the passenger as Gurdeep Singh, a.k.a. Deepa, who was holding an AK–47 rifle. Gurdeep Singh opened fire, wounding Makhan Ram in the thigh and foot. Sahab Singh was shot to death at the scene. While en route to the hospital, Makhan met police officer Inderjit Singh who took Makhan's statement. Although the original statement is not signed, in the 1998 supplement Makhan Ram identified Barapind by signing the reverse side of a picture of Barapind.

Barapind also submitted an affidavit of Makhan Ram, prepared in 2001, in which he denies having identified Barapind in a photograph or otherwise. Ram claims that the police falsely filed a drug case against him, and that while he was in custody, they forced him to prepare two false affidavits for this case. In addition, Barapind submits the affidavit of Kulwant Singh, who was listed as an identifying witness in F.I.R. 100, but refused to give any affidavit to the police. Kulwant Singh claims that he did not know Barapind and that he never gave any identifying statement to the police.

As the extradition court noted, Barapind does not provide any facts from which it is possible to evaluate motives or possible bias associated with the affidavits obtained in 2001. This lack of supporting information on the part of Barapind led the magistrate to state that "[a]lthough substantial doubt is created by the contradictory affidavits of Makhan Ram and Kulwant Singh, the competence of India's probable cause evidence requires a trial to resolve the existing material credibility disputes." *In re Extradition of Singh,* 170 F.Supp.2d at 1025. On its face, India's evidence established probable cause, and thus Barapind had the burden of negating that finding. The original affidavits provided some competent evidence for the magistrate's finding of probable cause, and thus the decision must be upheld.

### D. FIRs Lacking Probable Cause

With respect to FIRs 52, 87, and 220, Barapind submitted evidence of fabrication, coercion of witnesses, and witness torture respectively. The charges in FIR 52 rest entirely on the affidavits of Rajinder Kaur, who, in 1997, testified under oath during the trial of one of Barapind's alleged co-conspirators that she never identified Barapind. The crimes alleged in

FIR 87 were similarly supported; and the 2001 declaration of Rattan Singh alleges that he was forced under threat of death to provide his thumbprint for the Barapind identification, but that he in fact never identified Barapind as the perpetrator of those crimes. The sole basis to implicate Barapind in the charges in FIR 220 is the confession of his alleged accomplice Tarlochan Singh, who has since been killed by "cross-fire" during what the police describe as a "rescue attempt." Barapind, however, submitted three eyewitness affidavits which allege that Tarlochan was tortured by Indian police. The extradition court found that the evidence offered by Barapind with respect to these three FIRs was sufficient, not just to controvert, but to destroy probable cause as to the charges contained therein. *Id.*

■ Barapind argues that the acknowledgment of torture, forced confession, and unreliable evidence as to some of the FIRs should negate probable cause as to the entire body of India's evidence. We disagree.

We faced similar situations in *Mainero v. Gregg,* 164 F.3d 1199 (9th Cir.1999) and *Cornejo–Barreto v. Seifert,* 218 F.3d 1004 (9th Cir.2000). In *Mainero,* both the magistrate judge and the district court acknowledged that evidence of torture was present in the record. *Mainero,* 164 F.3d at 1206. However, both judges reviewed all of the statements and determined, as found by the magistrate judge, that "none of the evidence on which it is necessary to rely was obtained by torture." *Id.* The judge in *Cornejo–Barreto* also chose to isolate the taint that the alleged torture would have on the evidence by considering the sufficiency of the evidence without the challenged confessions. 218 F.3d at 1008. Similarly in this case, the magistrate reviewed each FIR individually, as was his exclusive province, and where there was

compelling and material evidence of fabrication, coercion, and torture, he appropriately found the totality of the evidence to be too unreliable to support probable cause. This discriminating approach is all the law requires. Not *all* evidence becomes fatally infected by discrete unrelated incidents.

## V

## THE POLITICAL OFFENSE EXCEPTION

### A. Standard of Review

■ The court's purely factual findings underlying the application of the political offense exception are reviewed for clear error. *Quinn,* 783 F.2d at 791. However, the crucial determination—whether the crime was incidental to a political uprising—is a mixed question of law and fact that must be reviewed de novo. *Id.* (citing *Ornelas v. Ruiz,* 161 U.S. 502, 509, 16 S.Ct. 689, 40 L.Ed. 787 (1896)). A conclusion that a crime is a political offense is a determination that the crime does not fall within the terms of the treaty.

### B. Analysis

■ The language of the applicable treaty is the essential component in analyzing the reach of the political offense exception to extradition. *McMullen v. INS,* 788 F.2d 591, 596 (9th Cir.1986). Article 6 of the Extradition Treaty provides as follows:

A fugitive criminal shall not be surrendered if the crime or offense in respect of which his surrender is demanded is one of a political character, or if he proves that the requisition for his surrender has, in fact, been made with a

view to try or punish him for a crime or offense of a political character.

Extradition Treaty, art. 6, T.S. No. 849.

Barapind argues that the political offense exception protects him from extradition because his crimes—with the exception of the crime charged in FIR 100— were of a political character.

■■■ The purpose of the political offense exception, however, is more narrow than its abstract label might suggest. Its core intention is to "protect acts that are directed at the State itself, and not to protect every criminal act that in some sense contributes to the political goal of those committing it." *McMullen*, 788 F.2d at 597 (citing *Quinn*, 783 F.2d at 798; *Eain v. Wilkes*, 641 F.2d 504, 520–23 (7th Cir.1981)). "Political motivation does not convert every crime into a political offense." *Ahmad v. Wigen*, 910 F.2d 1063, 1066 (2d Cir.1990); *see also McMullen*, 788 F.2d at 597 (quoting *Eain*, 641 F.2d at 520) ("Motivation is not itself determinative of the political character of any given act.").

■■■ The Supreme Court has addressed the political offense exception in only one case, *Ornelas v. Ruiz*, 161 U.S. 502, 16 S.Ct. 689, 40 L.Ed. 787 (1896), which established a two-prong test used to answer these questions. Commonly referred to as the "incidence test," *Ornelas's* two-prong test dictates that in order to be considered a political offense, there must be "1) the occurrence of an uprising or

other violent political disturbance at the time of the charged offense, and 2) a charged offense that is 'incidental to' 'in the course of,' or 'in furtherance of' the uprising." *Quinn v. Robinson*, 783 F.2d 776, 797 (9th Cir.1986); *see also McMullen*, 788 F.2d at 595; *Escobedo v. United States*, 623 F.2d 1098, 1104 (5th Cir.1980); *Sindona v. Grant*, 619 F.2d 167, 173 (2d Cir.1980).

"[T]he focus of inquiry is on the circumstances and status of those harmed and not merely on whether the acts were committed during the disorder." *In re Extradition of Demjanjuk*, 612 F.Supp. 544, 570 (D.Ohio 1985), *aff'd sub nom, Demjanjuk v. Petrovsky*, 776 F.2d 571 (6th Cir.1985). The Supreme Court has suggested that "the character of the foray, the mode of attack, the persons killed or captured, and the kind of property taken or destroyed" are appropriate factors to be considered when making this determination. *Ornelas*, 161 U.S. at 511, 16 S.Ct. 689. Moreover, the political offense exception "should be applied with great care lest our country become a social jungle and an encouragement to terrorists everywhere." *Eain v. Wilkes*, 641 F.2d 504, 520 (7th Cir.1981).

■■■ The determination as to what type of acts are incidental to the uprising is properly within the discretion of the magistrate.[2] A purely objective approach could lead to a situation where "isolated acts of social violence undertaken for personal reasons would be protected simply because they occurred during a time of

---

**2.** In *Quinn v. Robinson*, we stated that "[a]ll the courts should do is determine whether the conduct is related to or connected with the insurgent activities." *Quinn*, 783 F.2d at 810. *Quinn* seemingly suggests that the decision should be taken out of the hands of the magistrate, and given to the revolutionaries to decide what tactics will further their political aims. *Id.* The decision in *Quinn*, 783 F.2d at 814, however, rests exclusively on the failure to satisfy the "uprising" prong of the incidence test, and thus any attempt to reshape the "incidental to" prong is merely dicta. *See McMullen*, 788 F.2d at 596, 598 (noting parenthetically that the discussion in *Quinn*, suggesting the tactics used are irrelevant to the application of the political offense exception, is dicta). Accordingly we decline to follow the doubtful rationale set forth therein.

political upheaval." *Id.* at 521. We agree with the Seventh Circuit that "the law is not so utterly absurd," and that this is not the result the political offense exception was designed to produce. *Id.* at 520–21 ("Terrorists who have committed barbarous acts elsewhere would be able to flee to the United States and live in our neighborhoods and walk our streets forever free from any accountability for their acts."). Indeed, the magistrate must be given some freedom to deal with the intricacies of each case, and to determine whether the conduct is directly connected with, or in furtherance of, the insurgent activity. This cannot be accomplished unless the magistrate is able to subjectively evaluate the nature of the tactics employed. As we held in *McMullen*, the direct causal link between the crime committed and its alleged political purpose and object, "when balanced with proportionality and atrocity, must warrant the protection afforded a 'political' crime." 788 F.2d at 597.

The extradition judge in this case realized that a standard that looks solely to the revolutionary's generalized political intent is an unworkable, uncivilized standard, and undertook instead this balancing process for each and every FIR.

## C. Application of the Political Offense Exception: FIRs 89, 34 and 100

As discussed in the extradition order, the crimes with which Barapind is charged took place in the midst of the extended political clash between Sikh militants and the Indian government, and thus the uprising contextual prong has been satisfactorily established. *In re Extradition of Singh*, 170 F.Supp.2d at 1030–32. The only live issue, therefore, is whether the crimes for which Barapind is set to be extradited are incidental to the uprising. In other words, whether "there is a close and direct causal link between the crime committed and its alleged political purpose and object." *McMullen*, 788 F.2d at 597.

### 1. FIR 89: The Murder of Kulwant Kaur

■ The applicability of the political offense exception to the charges in FIR 89, the murder of the wife of a perceived police collaborator, hinges on whether or not the killing of an innocent civilian in the midst of an otherwise politically motivated attack falls within the exception. The extradition court recognized that the killing of the three brothers was incidental to the uprising; however, it found that Barapind failed to establish that the killing of Kulwant Kaur was "causally or ideologically related to the uprising." *Ornelas*, 161 U.S. at 511, 16 S.Ct. 689. As the extradition court observed, the record is silent as to the circumstances under which Kulwant Kaur was murdered. It is unknown whether she was murdered in cold-blood for being the spouse of a political opponent, or simply because she was present, or to eliminate an eyewitness.

■ Barapind rests his argument entirely on the dicta in *Quinn*. *Quinn*, he argues, stands for the proposition that one's status as a political revolutionary creates a license to kill innocent civilians with impunity. *Quinn*, 783 F.2d at 810 ("[T]here is no justification for distinguishing between attacks on military and civilian targets .... [i]t is for the revolutionaries, not the courts, to determine what tactics may help further their chances of bringing down or challenging the government."). We decline to adopt this uncivilized standard. We agree with the magistrate that the political offense exception is "inapplicable to shield the knowing effort to kill or injure unarmed, uninvolved, innocent civilians who are non-combatants in the struggle." *In re Extradition of Singh*, 170 F.Supp.2d at 1036 (citing *Ah-*

*mad,* 726 F.Supp. at 405–08 (condemning the slaughter of innocent civilians as not worthy of protection as a political offense); *Eain,* 641 F.2d at 520–21 ("[T]he indiscriminate bombing of a civilian populace is not recognized as a protected political act even when the larger "political" objective of the person who sets off the bomb may be to eliminate the civilian population of a country."); *In re Extradition of Marzook,* 924 F.Supp. 565, 577 (S.D.N.Y.1996) (stating that "attacks targeted at civilians do not advance any political motive other than as terrorist acts"); *In re Extradition of Demjanjuk,* 612 F.Supp. at 570 ("The civilian status of the victims is also significant because the United States does not regard the indiscriminate use of violence against civilians as a political offense.")). Barapind presents no evidence to satisfy his burden of showing that Kulwant Kaur was anything other than a civilian target, and therefore we uphold the magistrate's decision to certify extradition for FIR 89.

**2. FIR 34: The Murders of Bulwant Singh Sarhal, Amar Nath Kanugo, Suda Ram, and Jasbir Singh**

▉▉▉ The extradition judge stated that "[t]he evidence establishes that a former government official, active government official, and their police affiliated body guards were driving in a village, presenting a target of opportunity." The extradition magistrate determined that the fact that the victims were agents of the State was not sufficient to demonstrate that the killings were politically motivated, and that these facts equally support the finding that the crimes were acts of domestic terrorism. The fact that the ambush resulted in the assassination of government officials might suggest that the crime was of a political nature; however, Barapind must establish the offenses committed were incidental to the political uprising by a preponderance of the evidence. Given that no evidence of political activity or motive, other than the identity of the victims as agents of the State, was presented to the magistrate, we conclude that Barapind failed to meet his burden of proof.

**3. FIR 100: The Murder of Sahib Singh and the Attempted Murder of Makhan Ram**

Barapind does not contest the magistrate's determination that F.I.R. 100 does not fall within the political offense exception.

**D. Extradition Request as a Subterfuge**

▉▉▉ Barapind argues that the second clause of Article 6 of the Extradition Treaty—"that the requisition for his surrender has, in fact, been made with a view to try or punish him for a crime or offense of a political character"—must be interpreted to encompass the entire extradition request. Extradition Treaty, art. 6, T.S. No. 849. He reasons that because some of the crimes with which he was charged fall within the political offense exception, that fact alone proves that the Indian government is trying to punish him for his political activities, and thus the certification of extradition on three counts was improper. In essence, he argues that the political offense exception is an all or nothing proposition.

Assuming that the various branches of government are adequately performing their duties, the case law suggests otherwise. The doctrine of specialty "prohibits the requesting nation from prosecuting the extradited individual for any offense other than that for which the surrendering state agreed to extradite." *Quinn,* 783 F.2d at 783. In addition, as the court in *In re Lincoln,* stated

it is not a part of the court proceedings nor of the hearing upon the charge of crime to exercise discretion as to whether the criminal charge is a cloak for political action, nor whether the request is made in good faith. Such matters should be left to the Department of State. The government of the United States, through the Secretary of State, should determine whether the foreign government is in fact able to exercise its civil powers, and whether diplomatic and treaty relations are being carried out and respected in such a way that it is safe to surrender an alleged criminal under a treaty.

228 F. 70, 74 (E.D.N.Y.1915). Therefore, it is the independent duty of the Secretary of State to determine whether India is likely to comply with the directives of the treaty, and whether Barapind will receive a fair trial upon return. The magistrate is constrained by his duty to apply the law, and thus India's motivations for requesting the extradition are properly left to the Executive Branch, which has the responsibility to enforce the rule of specialty.

## VI

## CONCLUSION

For centuries, humankind has attempted in the name of civilization to replace force and violence as a political tool with the rule of law. In nations where democratic institutions and the ballot box provide a peaceful means for evolutionary change, it is unacceptable to circumvent the system and to pursue political or other goals by unlawfully raining down violence on a society and its citizens. In Quinn, as we have noted, a member of this court mused in dicta that "[i]t is for the revolutionaries, not the courts, to determine what tactics may help further their chances of bringing down or changing the government. All that the courts should do is determine whether the conduct is related to or connected with the insurgent activity." 783 F.2d at 810. We respectfully disagree. Tactics are not "simply irrelevant." Id. at 805. This overindulgent approach indiscriminately and unwisely delegates to the Timothy McVeighs, the John Wilkes Booths, and the Mohammed Attas of the world the final legal decision as to what conduct is cognizable under the "incidental to" test pursuant to treaties recognizing the political offense exception. The Quinn dicta wisely excludes crimes against humanity and acts of international terrorism from the reach of its extreme language, but it suffers from a classic case of allowing the foxes to have the last word on the fate of the chickens. Our criminal justice system periodically releases from its grip persons most likely guilty of serious crimes because of constitutional violations by authorities in bringing those persons before the bar of justice. However, it is the courts and the law that make these decisions, not the defendants.

On balance, we believe that the Seventh Circuit's approach in Eain has the wiser of the arguments. As recognized by Judge Duniway in Quinn, 783 F.2d at 819, the indiscriminate killings of civilians and police officers cannot and must not qualify for the political offense exception to extradition, even if "politically motivated." To hold otherwise is to open the door for our country to turn into "a social jungle and an encouragement to terrorists everywhere." Eain, 641 F.2d at 520. In international affairs and multi-lateral situations, one cannot ignore the principle of reciprocity: what goes around comes around.

Change, even important change, brought about by the rule of law may take time. Success for a laudable cause sometimes does not come easily. Democratic institutions may be slow, daunting, and occasionally disappointing. But, in the final analy-

sis, the rule of law is the only modality that appropriately serves our purpose as we march forward through time towards our universal goal of equality under the law with life, liberty, and the pursuit of happiness for all. In our nation, it took an excruciating six decades to progress from the awful mistake of separate but equal to freedom, but thanks to giants such as Charles Hamilton Houston and Thurgood Marshall, who tirelessly took their compelling case for equality and dignity to the courts, *Brown v. Board of Education* became the law of the land, and the last major legal obstacle was felled. We are still on that determined and hopefully accelerated path towards fulfillment of our national aspirations, and it is the civilized rule of law that will successfully enable us to shed our unwanted baggage and guide us to our goal, not terrorist attacks on the symbols of our government and the innocent inhabitants of our country.

This reality, however, must not be interpreted as a message only to those on the outside who seek change from the legal status quo. Government also needs to take an active leadership role in righting old wrongs and delivering to the People the guarantees articulated in our Constitution and the Declaration of Independence. The demise of *Plessy v. Ferguson* was too long in coming. We must absorb and learn the lesson of this sad period of our history if we are not to repeat it. If, functioning as a government, we the People expect the continued consent of the governed to the rule of law and to its legislative judgments and legal verdicts, then we must be open and receptive in all of the branches of our government to the legitimate grievances brought to our attention. It is up to both government and the

People to work together within the framework of our institutions towards the society ensured by the founders of our Constitution, where as Lincoln said, government is "of the people, by the people, [and] for the people," and with liberty and justice for all.

Finally, these are lessons and prescriptions for prosperity that all governments must take to heart if they expect fully to participate in the community of nations willing to extradite persons to each other for adjudications that will affect their lives and their liberty.

AFFIRMED.