FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KULVIR SINGH BARAPIND,
              *Petitioner-Appellant,*

              v.

JERRY J. ENOMOTO, United States
Marshal for the Eastern District of
California,

              *Respondent-Appellee.*

No. 02-16944

D.C. No.
CV-01-06215-OWW

OPINION

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, District Judge, Presiding

Argued and Submitted
October 14, 2004—San Francisco, California

Filed March 9, 2005

Before: Mary M. Schroeder, Chief Judge, Alex Kozinski,
Pamela Ann Rymer, Andrew J. Kleinfeld,
Michael Daly Hawkins, Sidney R. Thomas, Susan P. Graber,
William A. Fletcher, Richard C. Tallman,
Johnnie B. Rawlinson and Consuelo M. Callahan,
Circuit Judges.

Per Curiam Opinion;
Partial Concurrence and Partial Dissent by Judge Rymer

**COUNSEL**

Jagdip Singh Sekhon, Sekhon & Sekhon, San Francisco, California, for the appellant.

Stanley A. Boone, Assistant United States Attorney, Fresno, California, for the appellee.

## OPINION

PER CURIAM:

We consider whether the district court erred in denying Kulvir Singh Barapind's habeas corpus petition challenging the certification of his extradition to India.

## FACTS[1]

Barapind, a native and citizen of India, is a prominent leader of the All India Sikh Student Federation. The Federation is dedicated to establishing an independent sovereign Sikh nation. From the mid-1980s through the early 1990s, while Barapind was still in India and an active Federation member, Sikh insurgents frequently clashed with the Indian government and its supporters, resulting in tens of thousands of casualties.

In 1993, Barapind came to the United States using a passport bearing a false name and was immediately detained by the Immigration and Naturalization Service (INS). He applied for asylum and withholding of deportation, asserting that he would face persecution if he were returned to India, but the immigration judge denied relief and ordered him excluded. On habeas review, a panel of this court affirmed the district court's remand to the Board of Immigration Appeals, finding that the immigration judge committed legal errors. *See Barapind* v. *Rogers*, 114 F.3d 1193 (9th Cir. 1997) (mem.).

---

[1]For a complete description of the facts, see the extradition court's thorough opinion in *In re Extradition of Singh*, 170 F. Supp. 2d 982 (E.D. Cal. 2001). We set forth only those facts relevant to this appeal.

Barapind's asylum proceedings were then interrupted by India's request that the United States extradite him.[2]

India requested Barapind's extradition pursuant to its extradition treaty with the United States.[3] *See Quinn* v. *Robinson*, 783 F.2d 776, 782 (9th Cir. 1986) ("The right of a foreign sovereign to demand and obtain extradition of an accused criminal is created by treaty."). The Treaty provides for extradition of a person suspected of committing certain crimes when the evidence of the person's guilt would be sufficient to bring him to trial in the United States if his crimes had been committed here. *See* art. 9. Certification of extradition is lawful only when the requesting nation has demonstrated probable cause to believe the accused person is guilty of committing the charged crimes. *See Quinn*, 783 F.2d at 783; *see also Cornejo-Barreto* v. *Seifert*, 218 F.3d 1004, 1009 (9th Cir. 2000).

The United States filed a complaint on India's behalf and requested a warrant to bring Barapind before an extradition court for a hearing to determine extraditability. *See* 18 U.S.C. § 3184. The district court issued the warrant, Barapind was transferred from INS custody and the district court conducted an extradition hearing.[4]

India sought Barapind's extradition based on crimes arising out of eleven separate incidents. The extradition court denied

---

[2]Barapind unsuccessfully challenged the interruption of asylum proceedings. *See Barapind* v. *Reno*, 225 F.3d 1100, 1114 (9th Cir. 2000).

[3]The relevant treaty is, as the parties have stipulated, the Treaty for the Mutual Extradition of Criminals Between the United States of America and Great Britain, Dec. 22, 1931, U.S.—Gr. Brit., 47 Stat. 2122, made applicable to India in 1942, *see* Treaty Affairs Staff, United States Dep't of State, *Treaties in Force* 132 (1999).

[4]The hearing was held before District Judge Oliver W. Wanger. *See* 18 U.S.C. § 3184. Judge Wanger was also the district judge who considered and denied Barapind's petition for a writ of habeas corpus, the decision currently on appeal before us. *See* note 5 *infra*.

certification of extraditability for the crimes relating to eight of the incidents, concluding either that India failed to show probable cause to suspect Barapind of the crimes, or that extradition was inappropriate because the crimes were covered by the Treaty's political offense exception, which bars extradition for crimes "of a political character." *See* art. 6. The court certified extradition for offenses stemming from the three remaining incidents.

Barapind petitioned for a writ of habeas corpus, arguing that the charges for which his extradition was certified were not supported by probable cause or fell under the political offense exception.[5] The district court denied his petition, and Barapind appealed. A three-judge panel of this court affirmed, *see* 360 F.3d 1061 (9th Cir. 2004), and we subsequently voted to rehear the case en banc, *see* 381 F.3d 867 (9th Cir. 2004) (order).

## ANALYSIS

Because our review of the district court's decision on questions of law and mixed questions of law and fact is de novo, *see Quinn*, 783 F.2d at 791-92, and because the district court on habeas review accepted the factual findings of the extradition court, we focus on the extradition court's opinion. Thus, we determine whether the extradition court erred in certifying extraditability for crimes arising out of three incidents, designated as FIR 100, FIR 89 and FIR 34.[6]

---

[5]Decisions of an extradition court are not directly reviewable but may be challenged collaterally by a petition for habeas corpus. *See Mainero* v. *Gregg*, 164 F.3d 1199, 1201-02 (9th Cir. 1999).

[6]"FIR" stands for First Information Report, a summary report prepared by the Indian police when certain serious crimes are committed. The litigants have used the FIR designations to refer to the incidents from which Barapind's charges arise. We follow this convention.

**General Challenges to Extraditability**

Barapind asserts two claims applicable to all three incidents.

**1.** First, he contends that India's evidence against him was incompetent. Barapind focuses on the fact that the witness statements produced by India were unsigned translations, on which the extradition court should not have relied.

**[1]** Barapind misunderstands the nature of extradition proceedings. "With regard to the admissibility of evidence, the general United States extradition law requires only that the evidence submitted be properly authenticated." *Emami* v. *United States Dist. Court*, 834 F.2d 1444, 1451 (9th Cir. 1987). The authentication requirements for documentary evidence are contained in 18 U.S.C. § 3190, which specifies that "the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that [submitted documents] are authenticated in the manner required." Here, it is undisputed that the evidence presented against Barapind was properly authenticated pursuant to section 3190, and the Treaty itself contains no supplementary authentication requirements. We therefore reject Barapind's claim that the extradition court erred in relying upon the authenticated documentary evidence submitted by India.

**[2]** Barapind also argues that the evidence against him is unreliable because it was fabricated or obtained by torture. The extradition court, however, conducted a careful, incident-by-incident analysis as to whether there was impropriety on the part of the Indian government. Its findings that the evidence regarding FIR 100, FIR 89 and FIR 34 was not the product of fabrication or torture were not clearly erroneous. *See Mainero* v. *Gregg*, 164 F.3d 1199, 1205 (9th Cir. 1999) ("Factual determinations by a . . . judge in an extradition proceeding are reviewed for clear error.").

**2.** Next, Barapind claims that because *some* of the charges for which India requested his extradition were deemed to be political offenses, he cannot be extradited on any charges, even those not covered by the political offense exception. He bases his argument on article 6 of the Treaty, which protects a fugitive from extradition if "he proves that the requisition for his surrender has, in fact, been made with a view to try or punish him for a crime or offence of a political character."

**[3]** Barapind reads this language as preventing a fugitive's extradition if any of his charged offenses were crimes of a political character. But he can point to no authority for such a drastic interpretation. Nor is his argument consistent with the doctrine of specialty, which "prohibits the requesting nation from prosecuting the extradited individual for any offense other than that for which the surrendering state agreed to extradite," *Quinn*, 783 F.2d at 783, and which is incorporated into the terms of the Treaty, *see* art. 7 ("A person surrendered can in no case be . . . brought to trial . . . for any other crime or offence . . . than those for which the extradition shall have taken place . . . ."). The doctrine of specialty suggests the more general proposition that an extradition court should consider each offense separately in determining whether an extradition requisition is based on a political crime. The fact that some crimes are found to be non-extraditable political offenses has no bearing on whether certification of extradition is appropriate for crimes that are not political offenses.

### Incident-Specific Challenges

Finding both of Barapind's universal challenges to the extradition court's decision to be meritless, we turn to his incident-specific claims.

**1.   FIR 100.** India charges Barapind with murder and attempted murder, alleging that he drove a scooter while a gunman riding with him killed one man and wounded another.

Barapind contends that India did not establish probable cause to believe he committed these crimes.

In reviewing an extradition court's probable cause determination for evidentiary sufficiency, we ask whether the court's finding was supported by "competent evidence." *See Mainero*, 164 F.3d at 1205 (quoting *Zanazanian* v. *United States*, 729 F.2d 624, 626 (9th Cir. 1984)). To establish probable cause, India relied in significant part upon a translated statement of Makhan Ram, the man who was wounded in the shooting, identifying Barapind as the driver. Barapind attempted to destroy probable cause by submitting a more recent affidavit from Makhan wherein he claims that he never identified Barapind. This affidavit states that the Indian police forced Makhan to sign a blank sheet of paper, which they subsequently turned into affidavits identifying Barapind.

The extradition court recognized that a fugitive facing extradition can present his own evidence to explain away the requesting government's evidence of probable cause. *See Singh*, 170 F. Supp. 2d at 994; *see also Mainero*, 164 F.3d at 1207 n.7 ("Generally, evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible."). The court concluded, however, that "the credibility of Makhan Ram's recantation cannot be determined without a trial," *Singh*, 170 F. Supp. 2d at 1024, which would exceed the limited mandate of an extradition court in making a determination of probable cause, as opposed to ultimate guilt.

**[4]** The extradition court was supported by competent evidence in finding that Barapind did not obliterate India's showing of probable cause, as Makhan's more recent affidavit constituted conflicting evidence, the credibility of which could not be assessed without a trial. Because extradition courts "do[ ] not weigh conflicting evidence" in making their

probable cause determinations, *Quinn*, 783 F.2d at 815, we find no basis for overturning the extradition court's decision that probable cause of Barapind's guilt existed with respect to FIR 100.

**2. FIR 89.** The extradition court also certified extraditability for an incident involving four murders allegedly committed by Barapind and three accomplices after they invaded a house. Barapind's group went to the home of Sohan Singh and his wife looking for Sohan's three sons, who were thought to be police collaborators. Barapind immediately shot and killed two of the sons, and the group asked Sohan's wife where the third son was. She told the assailants that he was sleeping in another room. Barapind's accomplices went to the room and killed the third son along with his wife, Kulwant Kaur.

Before the extradition court, Barapind argued that he could not be extradited based on the crimes arising out of this incident, as they were non-extraditable political offenses under article 6 of the Treaty. The court agreed that the murders of the three sons were political offenses, but it certified extradition for the murder of Kulwant. Barapind challenges this certification.

**[5]** To determine whether the political offense doctrine bars extradition, we apply a two-prong "incidence test." For a crime to qualify as "one of a political character," Treaty art. 6, there must be: "(1) the occurrence of an uprising or other violent political disturbance at the time of the charged offense, and (2) a charged offense that is 'incidental to' 'in the course of,' or 'in furtherance of' the uprising," *Quinn*, 783 F.2d at 797 (footnotes and citations omitted).

**[6]** There is no real doubt that the crimes Barapind is accused of committing occurred during a time of violent political disturbance in India. As the extradition court noted, "[t]ens of thousands of deaths and casualties" resulted

between the mid-1980s and early 1990s as Sikh nationalists clashed with government officers and sympathizers in Punjab. *Singh*, 170 F. Supp. 2d at 1032. Substantial violence was taking place, and the persons engaged in the violence were pursuing specific political objectives. *Cf. Quinn*, 783 F.2d at 807.

The dispute between the parties concerns the "incidental to" prong, which asks whether Barapind's crimes were "causally or ideologically related" to the political uprising. *Id.* at 809. In *Quinn*, we discussed the "incidental to" analysis in depth, stating that extradition courts should focus not on the types of acts alleged, but rather on the motivation for those acts. *See id.* at 809-10.

The extradition court found that it was not bound by *Quinn*'s discussion of the "incidental to" prong. This part of our opinion was "dicta," the court stated, because Quinn's extraditability was ultimately based on his failure to satisfy the "uprising" prong. The court explained that our discussion of "incidental to" was not necessary to our ultimate disposition of *Quinn*, and our ruling on the issue was therefore not binding. *See Singh*, 170 F. Supp. 2d at 998.

**[7]** The extradition court operated under a mistaken understanding of what constitutes circuit law. In *Quinn*, the proper scope of "incidental to" was an issue presented for review. We addressed the issue and decided it in an opinion joined in relevant part by a majority of the panel. Consequently, our articulation of "incidental to" became law of the circuit,[7] regardless of whether it was in some technical sense "necessary" to our disposition of the case.[8] *See Cetacean Cmty.* v.

---

[7]Any statement to the contrary in *McMullen* v. *INS*, 788 F.2d 591, 598 (9th Cir. 1986), is overruled.

[8]The partial dissent claims that our "discussion about dicta is dicta." Dissent at 3028. However, we need not go back very far to find an en banc court—the body charged with "maintain[ing] uniformity of the court's decisions," Fed. R. App. P. 35(a)—announcing a binding legal principle

*Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004); *Miranda B.* v. *Kitzhaber*, 328 F.3d 1181, 1186 (9th Cir. 2003) (per curiam); *United States* v. *Johnson*, 256 F.3d 895, 914-16 (9th Cir. 2001) (en banc) (Kozinski, J., concurring). The extradition court thus erred in concluding that it was not required to follow *Quinn*.[9]

---

for three-judge panels and district courts to follow even though the principle was technically unnecessary to the court's disposition of the case before it. In *Miller* v. *Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc), we held that "where the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority," *id.* at 893, three-judge panels and district courts "should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled," *id.* at 900. Of course, this holding was not strictly necessary to our disposition of the case, for we were sitting en banc and thus were not required to follow prior circuit law in any event. Nevertheless, we announced the rule to guide three-judge panels and district courts in deciding which precedents were binding on them.

Likewise, in *Atonio* v. *Wards Cove Packing Co.*, 810 F.2d 1477 (9th Cir. 1987) (en banc), we held that a three-judge panel faced with contradictory controlling precedents "must call for en banc review." *See id.* at 1478-79. Again, this holding, which we subsequently reaffirmed en banc, *see United States* v. *Hardesty*, 977 F.2d 1347, 1348 (9th Cir. 1992) (en banc) (per curiam), would have been non-binding "dicta" by the dissent's definition. *See* dissent at 3029.

Our opinion provides a supervisory function similar to *Miller* and *Atonio* by instructing three-judge panels and district courts about how to determine what law is binding on them. It thus constitutes authoritative circuit law. *See Miller*, 335 F.3d at 904 (Tashima, J., concurring) ("[W]hen the en banc court exercises its supervisory authority over three-judge panels, its decisions should be recognized as authoritative and binding," even with respect to matters that are "not necessary to the decision of the case.").

[9]Because the offenses at issue in this case present relatively straightforward applications of the political offense exception, we have no occasion to consider whether to endorse in all cases *Quinn*'s statement that, in deciding whether an act is incidental to a political uprising, "[a]ll that the courts should do is determine whether the conduct is related to or connected with the insurgent activity." 783 F.2d at 810. We leave for another day the question whether some exceptional circumstances might arise in which the relationship between the political goal and the act would be too tenuous to fall under the political offense exception.

**[8]** The court nonetheless reached the correct result, as Barapind failed to demonstrate that Kulwant's murder was a political offense. Indeed, even though it mislabeled the *Quinn* articulation of "incidental to" as dicta, the court properly concluded that Barapind's proffered evidence would not satisfy the *Quinn* formulation. *See Singh*, 170 F. Supp. 2d at 1036-37. Under *Quinn*, a court may not rely on a fugitive's mere assurance that a crime had some political purpose. Rather, the fugitive has the burden of showing a factual nexus between the crime and the political goal. In this case, all we know about Kulwant is: (1) she was the wife of a suspected police collaborator; and (2) Barapind's crew did not intend to kill her based on any of her political beliefs or affiliations. But we do not know why Barapind's accomplices did, in fact, kill Kulwant. Was it an accident? Was it because she attempted to interfere with the murder of her husband? Or were the men attempting to eliminate witnesses who could later identify them—and, if so, why didn't they also kill Sohan and his wife?

**[9]** Barapind has not answered any of these questions. As the extradition court noted, he has provided no evidence at all to explain the motive for Kulwant's murder. *See Singh*, 170 F. Supp. 2d at 1036. Without such evidence, there is no basis for finding that the murder was a political offense under *Quinn*. Because Barapind failed to prove that his charge fell under the political offense exception, the extradition court properly certified his extraditability for Kulwant's murder.

Barapind also argues that there was insufficient evidence to establish probable cause of his guilt. He was not in the room when Kulwant was killed, and he contends that India did not show he shared his accomplices' intent to kill her. The extradition court, however, found that Barapind came to the house with his accomplices, personally shot and killed two men and waited while the accomplices went to kill the third man and Kulwant. While these facts alone might not be sufficient to prove beyond a reasonable doubt that Barapind shared his

accomplices' intent to murder Kulwant, they do provide competent evidence for finding probable cause of Barapind's guilt as an accomplice or co-conspirator.[10] *See Quinn*, 783 F.2d at 815; *see also Collins* v. *Loisel*, 259 U.S. 309, 316 (1922) ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.").

**3. FIR 34.** Finally, the extradition court certified extradition based on India's allegation that Barapind was one of the men responsible for committing four murders that occurred during a shootout between Sikh insurgents and an Indian government officer, a former officer and their bodyguards. The strongest evidence India produced to support its charges was the affidavit of a police inspector who claimed that an eyewitness, Nirmal Singh, identified Barapind as one of the shooters. Barapind responded with an affidavit from Nirmal stating that he never identified Barapind or any other participant in the shootout. The extradition court determined that Barapind's evidence was insufficient to destroy probable cause, concluding that a trial would be required to determine who was telling the truth. *See Singh*, 170 F. Supp. 2d at 1028. The court was justified in making this decision. *See Quinn*, 783 F.2d at 815; *see also* pages 3025-26 *supra*.

Barapind also claims that the crimes included in FIR 34 constituted political offenses. The extradition court recognized that all of the victims were agents or former agents of the Indian government, and that India charged violations of its Terrorist and Disruptive Activities Act (TADA). Nevertheless, the court found that Barapind did not establish that the charged crimes were political offenses, as "[w]hether this

---

[10]The extradition court certified Barapind's extradition based on his charge of murder under Sections 302 and 34 of the Indian Penal Code. Section 34 provides that a person is guilty of a "criminal act . . . done by several persons in furtherance of the common intention of all."

attack was a domestic terrorist attack or politically motivated cannot be determined." *Singh*, 170 F. Supp. 2d at 1035.

**[10]** As noted above, however, the extradition court incorrectly concluded that it was not bound by *Quinn*'s interpretation of the political offense exception. Further, unlike its discussion of FIR 89, *see Singh*, 170 F. Supp. 2d at 1036-37, the extradition court's discussion of FIR 34 did not explain how the court would apply *Quinn*'s "incidental to" analysis to Barapind's case. This is particularly important given that there is at least some evidence, including the affiliation of the victims with the Indian government and India's charging of TADA violations, that might suggest the crimes were political offenses. We remand for consideration of how the *Quinn* political offense analysis applies to the crimes charged in FIR 34.

## CONCLUSION

**[11]** We affirm the district court's denial of Barapind's habeas petition with respect to FIR 100 and FIR 89. We reverse as to FIR 34. Given that extradition is proper on two of the grounds specified by the extradition court, we remand to the district court to determine whether it is necessary and appropriate to revise its ruling as to FIR 34.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**

---

RYMER, Circuit Judge, with whom KLEINFELD, TALLMAN, RAWLINSON, and CALLAHAN, Circuit Judges, join, concurring in the judgment in part and dissenting in part:

This appeal requires us to decide whether there is any competent evidence to support the extradition court's finding of probable cause that Kulvir Singh Barapind committed multi-

ple murders and, if so, whether the crimes charged are of a "political character" which the extradition treaty between the United States and India protects from extradition. This, in turn, requires us to settle the standard by which we determine that question.

In my view there was competent evidence of the criminality of Barapind with respect to each of the three incidents at issue. Given my belief that probable cause also exists on all three charges, I must decide whether the political offense exception applies. Although we suggested a standard in *Quinn v. Robinson*, 783 F.2d 776, 809-10 (9th Cir. 1986), for whether an offense is "incidental to" a political uprising and thus within the exception, we are now sitting en banc and so are free to consider whether that standard, or some other, should govern. I believe we should overrule *Quinn*'s elaboration of the "incidental to" prong and instead follow the approach articulated by the Supreme Court in *Ornelas v. Ruiz*, 161 U.S. 502, 511 (1896), by considering the "character of the foray, the mode of attack, the persons killed or captured, and the kind of property taken or destroyed." Applying these factors, I cannot say that the extradition magistrate had "no choice" but to hold that the ordinary crimes Barapind committed against civilian non-combatants were of a political character. *Id*.

Accordingly, I would affirm the district court across the board.

I

The extradition magistrate certified that Barapind is extraditable for three offenses: the murder of Kulwant Kaur as charged in First Information Report (FIR) 89; the murders of Balwant Singh Sarhal, Amar Nath Kanugo, Suda Ram and Jasbir Singh as charged in FIR 34; and the murder of Sahab Singh, a.k.a. Sahbi, and the attempted murder of Makhan Ram

as charged in FIR 100. *In re Extradition of Singh*, 170 F.Supp.2d 982 (E.D. Cal. 2001).

The court accepted expert testimony that there was a civil war in the Punjab during the 1980s and 1990s, which was at its zenith in 1991. The Khalistan Commando Force (KCF) was a militant wing of the Sikh separation movement. KCF regularly assassinated Punjabi police and members of security forces. While in college Barapind, a Sikh, was an active member of the All India Sikh Student Federation, a group committed to establishing a sovereign Sikh nation of Khalistan to be created from the Punjab state. He became president of the Federation for the District of Jalandhar in 1988.

India's evidence upon which the extradition magistrate found probable cause of Barapind's guilt in FIR 89 shows that on September 6, 1992, Sohan Singh was sleeping on the roof of his residence in the village of Tarkham Majera, with his wife, Gurmail Kaur, and two of their sons, Paramjit Singh and Kashmir Singh. The third son, Karamjit Singh, and his wife, Kulwant Kaur, were sleeping in a room in the house. All three sons were pro-police and had been issued arms and ammunition. Around 2:00 a.m., four persons, one of whom Sohan Singh identified as Barapind, came onto the roof. Barapind shot and killed Kashmir Singh with an AK-47, then shot Paramjit Singh to death. When the assailants asked where the third son was, Gurmail Kaur told them he was sleeping in another room. Barapind stayed on the roof while the others shot Karamjit Singh and Kulwant Kaur to death.

The evidence in FIR 100 shows that at 7:15 p.m. on October 26, 1991, Makhan Ram and Sahab Singh were about to cross railway tracks when they encountered two individuals on a scooter. Makhan Ram identified the driver as Barapind, and the passenger as Gurdeep Singh, who was holding an AK-47. Gurdeep Singh opened fire, wounding Makhan Ram and killing Sahab Singh. Two other individuals also allegedly participated.

Finally, the evidence in FIR 34 indicates that around 7:30 p.m. on April 26, 1992, Barapind, Gurdeep Singh, Harminder Singh, and another young man, armed with AK-47 rifles, came from the side of the road that leads from the village of Dhandwar to the village of Garhi Mohan Singh. Balwant Singh Sarhal, an ex-Member of the Legislative Assembly, along with Amar Nath Kanugo of the Deputy Commissioner's Office, Jalandhar, and two constables, Suda Ram and Jasbir Singh, came from the side of village Garhi Mohan Singh in a "gypsy vehicle." Barapind, Gurdeep Singh and Harminder Singh opened fire and shot and killed all four occupants. The assailants then took the constables' weapons and left.

## II

I agree with the majority that India's affidavits are neither incompetent nor unreliable on any of the grounds asserted, and that there is probable cause of Barapind's guilt on all three FIRs for reasons the majority explains. I part company on how we should treat the issue of whether Barapind's offenses are of a "political character."

Barapind argues that Article VI of the extradition treaty with India bars his extradition because the offenses charged in FIRs 34 and 89 are of a political character. Article VI provides:

> A fugitive criminal shall not be surrendered if the crime in respect of which his surrender is demanded is one of a political character, or if he proves that the requisition for his surrender has, in fact, been made with a view to try to punish him for a crime or offense of a political character.

Treaty for the Mutual Extradition of Criminals between the United States of America and Great Britain, Dec. 22, 1931, U.S.-Gr. Brit., T.S. No. 849 (1932). The question for the habeas court, and thus for us on appeal, is whether the

offenses charged are non-extraditable crimes within the terms of the treaty, that is, whether each is "of a political character."

A

Barapind's first contention — that the phrase "requisition for his surrender" in Article VI should be construed as referring to the entire extradition request — is easily resolved. To the extent Barapind's concern is that India might try him for crimes other than those certified, I agree with the majority that the doctrine of speciality prohibits the requesting country from prosecuting the fugitive for any offense except for those on which the United States agrees to extradite. Thus, Barapind may only be prosecuted for nonpolitical offenses. To the extent his point is that the requisition clause prevents extradition if *any* offense for which he is charged is political, it makes little sense because construing the treaty in this way would skirt the doctrine of speciality and insulate non-political offenses from extradition. Beyond this, it is within the sole discretion of the Secretary of State to determine whether a country's extradition request is a subterfuge for punishing the accused for a political crime. *Quinn*, 783 F.2d at 789 (citing *In re Lincoln*, 228 F. 70 (E.D.N.Y. 1915), *aff'd per curiam*, 241 U.S. 651 (1916)); *Eain v. Wilkes*, 641 F.2d 504, 513 (7th Cir. 1981) (also citing *Lincoln* and Note, *Executive Discretion in Extradition*, 62 Colum. L. Rev. 1313, 1323 (1962)).

In default of his preferred reading, Barapind falls back to a somewhat different interpretation of "requisition for surrender" as referring to the underlying incident encompassing the offense. The effect in this case would be to insulate Barapind from extradition on FIRs 89 and 34 because in both cases victims of the offenses included members of the Indian security forces (against whom there is evidence that the Sikh militant uprising was directed). This view fares no better. Article VI of the treaty protects "crime[s] or offense[s]" of a political character, not the broader incidents in which those crimes or

offenses occur. If Barapind were correct, a fugitive would be protected from extradition for *all* crimes that occur during an attack so long as the attack had political overtones. In this way the use of lethal violence against civilians who are innocent parties, for example, would be protected even though it is the common crime of murder. I do not read the treaty as permitting any such thing.

B

The more difficult issue is what the treaty (and other treaties like it) mean by the exception for offenses of a "political character." The treaty itself affords no help because it doesn't define "political."

Our court wrote extensively on the subject in *Quinn*. We noted a confusion about definitions, but observed that it is "fairly well accepted" that there are two categories of political offenses — "pure" and "relative." 783 F.2d at 793. We stated that "pure" political offenses are acts aimed directly at the government and have none of the elements of ordinary crimes, while "relative" political offenses include common crimes committed in connection with a political act or for a political motive or in a political context. *Id.* at 793-94 (citations omitted). We observed that United States courts have generally adhered to an "incidence test" with two requirements: "(1) the occurrence of an uprising or other violent political disturbance at the time of the charged offense, and (2) a charged offense that is 'incidental to,' 'in the course of,' or 'in furtherance of' the uprising." *Id.* at 797 (internal citations omitted). We declined to embrace limitations adopted by the Seventh Circuit in *Eain*, including in particular how it defined "uprising" as a struggle between organized military forces, determined the legitimacy of given political objectives, and excluded violent acts against innocent civilians from the exception. *Id.* at 802, 808. We concluded that the incidence test protects acts of domestic violence in connection with a struggle for political self-determination, but does not

protect acts of international terrorism. *Id.* at 806. With respect to the "incidental to" component, we adopted a "liberal nexus standard" under which neither proof of the potential or actual effectiveness of the actions in achieving the group's political ends nor of the fugitive's motive or membership in the uprising group is determinative. *Id.* at 809. We remarked that "[i]t is for the revolutionaries, not the courts, to determine what tactics may help further their chances of bringing down or changing the government." *Id.* at 810. Thus, "there is no justification for distinguishing . . . between attacks on military and civilian targets." *Id.*

The panel in this case and the district court both declined to follow *Quinn*'s "incidental to" analysis because *Quinn* held that the fugitive failed to meet the "uprising" prong, thereby making the rest of its discussion dicta. *Barapind v. Enomoto*, 360 F.3d 1061, 1074 n.2, 1075 (9th Cir. 2004); *In re Extradition of Singh*, 170 F.Supp.2d at 998. The panel then agreed with the extradition magistrate that the political offense exception is " 'inapplicable to shield the knowing effort to kill or injure unarmed, uninvolved, innocent civilians who are non-combatants in the struggle.' " 360 F.3d at 1075 (quoting *In re Extradition of Singh*, 170 F.Supp.2d at 1036 (citing *Ahmad v. Wigen*, 726 F.Supp. 389, 405-08 (E.D.N.Y. 1989) (condemning the slaughter of innocent civilians as not worthy of protection as a political offense), *aff'd*, 910 F.2d 1063, 1066 (2d Cir. 1990); *Eain*, 641 F.2d at 520-21 (observing that "the indiscriminate bombing of a civilian populace is not recognized as a protected political act even when the larger 'political' objective of the person who sets off the bomb may be to eliminate the civilian population of a country"); *In re Extradition of Marzook*, 924 F.Supp. 565, 577 (S.D.N.Y. 1996) (stating that "attacks targeted at civilians do not advance any political motive other than as terrorist acts"); *In re Extradition of Demjanjuk*, 612 F.Supp. 544, 570 (N.D. Ohio 1985) (noting that "[t]he civilian status of the victims is also significant because the United States does not regard the indiscriminate use of violence against civilians as a political

offense"), *aff'd sub nom., Demjanjuk v. Petrovsky*, 776 F.2d 571 (6th Cir. 1985))).

We need not decide whether *Quinn*'s "incidental to" discussion is dicta because we are now en banc. The question for us is instead whether we should adhere to *Quinn*'s standard or overrule it.

i

I believe we must overrule *Quinn*, because indiscriminate violence against innocent persons should not qualify for the political offense exception to extradition, even if politically motivated. Nor should the propriety of committing common crimes be left to the perpetrators' discretion. And civilians *are* different from the military. Overruling *Quinn* would realign us with the two circuits that have addressed attacks on non-combatant civilian targets and held them to be unprotected. *See Ahmad*, 910 F.2d at 1066 (holding that an attack on a commercial bus carrying civilians is not a political offense despite political motivation); *Eain*, 641 F.2d at 520-21 (recognizing that the civilian status of victims is of significance in considering the political offense exception).

I believe *Quinn* must be overruled for the additional reason that it tries to set the parameters of a "political offense" for all time and all places. Suffice it to say, as Justice Denman did in the leading English case *In re Castioni*, [1891] 1 Q.B. 149: "I do not think it is necessary or desirable that we should attempt to put into language in the shape of an exhaustive definition exactly the whole state of things, or every state of things which might bring a particular case within the description of an offence of a political character." *Id*. at 155.

Having overruled *Quinn* in these respects, I would look to the Supreme Court's seminal treatment of whether an offense falls within a "political character" exception in *Ornelas.* The treaty in that case, with Mexico, excepted from extradition

any "crime or offense of a purely political character." A band of armed men passed over the Rio Grande from Texas into Mexico and attacked about 40 Mexican soldiers, killing and wounding some, capturing others, and taking their horses. 161 U.S. at 510. The band also violently assaulted private citizens, burning their houses, and appropriating their money, horses, and other property. *Id*. The fugitives' evidence indicated that there had been a revolutionary movement on the same border against the government the year before, and that the purpose of their expedition was the same as the earlier one. *Id*. at 511. The extradition magistrate determined that the acts for which extradition was sought were not of a purely political character so as to exclude them from the treaty with Mexico; the district court disagreed; and the Supreme Court reversed based on the character of the foray, the mode of attack, the persons killed or captured, and the kind of property taken or destroyed. *Id*. at 511-12.

While the terms of the treaty with Mexico — excepting crimes or offenses of a "purely" political character — are slightly narrower than the terms of the treaty with India, the Court's approach and the factors that informed its decision are equally instructive here. The factors that the Court considered focus on specific political events and the objective acts which constitute the crimes for which extradition is sought in order to determine whether those crimes were part of a political revolt, insurrection, or civil war. Neither the perpetrator's state of mind nor choice of tactics is determinative. However, it matters whether the foray is directly in aid of the uprising, how it was conducted, whether civilians or military were targeted, and what happened to the victims and their property.

*Ornelas* also tells us that a habeas court should not disturb the extradition magistrate's determination unless it can be said that the magistrate had "no choice" but to hold that the crime was of a political character. 161 U.S. at 511.

Considering the *Ornelas* factors and applying the standard of review it prescribes with respect to FIRs 34 and 89, I would uphold the district court:

*FIR 34*. There is no evidence explaining the attacks on the occupants of the gypsy vehicle. Two of the four victims were constables or "gunmen," which is arguably consistent with the KCF's agenda of targeting Punjabi police and members of security forces. However, Balwant Singh Sarhal was a former member of the Legislative Assembly and Amar Nath Kanugo was then an employee in the Deputy Commissioner's Office. The expert witness could not express an opinion as to whether murder of former government ministers was an act in further-ance of the Khalistan separation movement, so I need not decide whether it would make any difference if this were the object. So far as the record discloses, none of these victims was a combatant. Barapind took the victims' guns. For all that appears, he and his accomplices were taking advantage of a target of opportunity for mayhem, murder and theft like the marauders in *Ornelas*. I cannot say that the extradition magis-trate had no choice but to characterize this encounter as politi-cal given that it was directed at non-combatant civilians.

*FIR 89*. Sohan Singh's sons were "pro-police" collabora-tors who had been issued uniforms, arms and ammunition by the police for self-defense. There is evidence that they had terrorized the area by killing Khalistan militants and robbing innocent people. The police failed to take action to stop them. There is no substantial explanation in the record for why Karamjit Singh's wife, Kulwant Kaur, was also murdered. That she was in the wrong place at the right time is one possi-bility, but this is discounted by the fact that Sohan Singh and his wife, Gurmail Kaur, who were on the roof with two of their sons when those sons were murdered, were left unharmed. The attack occurred at 2:00 a.m. when Barapind and his three accomplices went onto the roof to kill Paramjit and Kashmir with AK-47 rifles and then sought out Karamjit. Although the three brothers were paramilitary operatives and

opponents of the Khalistan movement, Kulwant Kaur was an innocent party who was unarmed. There is no evidence that property was taken. The government does not challenge the extradition magistrate's determination that the murders of Paramjit, Kashmir and Karamjit were linked to the movement's political intentions, but there is nothing to suggest that the murder of Kulwant Kaur, a civilian, was committed in aid of the Khalistan separation movement. In these circumstances, I cannot say that the extradition magistrate had no choice but to hold that Kulwant Kaur's murder was a political offense.

For these reasons, I would hold that the district court was not "palpably erroneous in law" in determining that neither the offense charged in FIR 34 nor the offense charged in FIR 89 is of a political character. *Ornelas*, 161 U.S. at 509.

ii

The majority takes a different tack with respect to FIRs 34 and 89, holding that the extradition court operated under "a mistaken understanding of what constitutes circuit law," maj. op., *supra* at 3014, or, put differently, what is dicta. In its view, the proper scope of "incidental to" was presented in *Quinn*, we addressed the issue and decided it in a published opinion, and it therefore became the law of the circuit even though it may not have been necessary "in some technical sense" to the disposition. I disagree that we need to go there. We are now sitting en banc, and therefore can declare the law as we believe it to be regardless of what we have previously held. This is so no matter whether a particular part of a prior opinion was necessary to its decision or not. Thus, there is no point to holding that *Quinn*'s "incidental to" discussion is, or is not, dicta; instead, we can, and should, decide whether its discussion is now the law of the circuit because it ought to be, and whether the district court got it right or wrong. In short, the discussion about dicta is dicta.

iii

In any event, I would not fault the district court for being mistaken in its understanding of dicta. It stated that the court in *Quinn* did not have to reach or apply the "incidental to" component of the two-part incidence test because Quinn failed to satisfy the "uprising" prong. *In re Extradition of Singh*, 170 F.Supp.2d at 998. We said as much ourselves in *McMullen v. INS*, 788 F.2d 591, 596, 598 (9th Cir. 1986) (calling this part of the *Quinn* discussion dicta). We have also described discussions that are unnecessary to a decision as dicta. *See, e.g., United States v. Johnson*, 256 F.3d 895, 920 (9th Cir. 2001) (en banc) (Tashima, J., concurring); *Export Group v. Reef Indus., Inc.*, 54 F.3d 1466, 1471-72 (9th Cir. 1995). So has the United States Supreme Court, *see, e.g., NLRB v. Int'l Bhd. of Elec. Workers, Local 340*, 481 U.S. 573, 591 n.15 (1987) (declaring that a statement in a previous decision was dictum because it "was unnecessary to the disposition"); *Local 144 Nursing Home Pension Fund v. Demisay*, 508 U.S. 581, 592 n.5 (1993) (declaring statements in earlier cases dicta because they were "uninvited, unargued, and unnecessary to the Court's holdings"), and so does *Black's Law Dictionary*, which defines "obiter dictum" as: "A judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential." *Black's Law Dictionary* 1102 (8th ed. 2004).

iv

If pressed to take a position, which the majority's opinion unfortunately forces me to do, I would stick with the traditional understanding of dictum as a statement that is not necessary to the decision.[1] Like obscenity, it doesn't seem fruitful

---

[1] As Judge Posner points out, there are numerous ways to define dictum, and various reasons why holdings are distinguished from dicta that may shed light on how a particular passage should be treated. *United States v. Crawley*, 837 F.2d 291 (7th Cir. 1988).

to try to pin down a more precise definition. I would leave it to panels, and to district courts, to sort out the occasional gratuitous observation from an authoritative holding, as we always have. They'll know it when they see it — and if they see it differently from the active judges on this court, the remedy is a rehearing en banc which vacates the panel opinion and affords the court as a whole the opportunity to validate a prior statement or to void it. This is far more benign than the majority's approach, which invites overwriting that may be difficult or impossible to cure.

It is one thing for a court of last resort to announce that whatever it says in a published opinion is binding, for a court of last resort regularly sits en banc, has ultimate responsibility for the efficient administration of justice within its province, and may not have enough cases to flesh out the rule being articulated. It is another for an intermediate court such as ours to make every reasoned discussion in a published opinion binding whether it is necessary or not. We speak through panels of three, and as Article III judges have authority only to decide cases and controversies. Everything that ends up in F.3d cannot possibly be the law of the circuit. Views of two or three judges in an opinion on matters that are not necessarily dispositive of the case are no different from the same views expressed in a law review article; neither should be treated as a judicial act that is entitled to binding effect.

Accordingly, I dissent from the majority's holding in this respect as well, for I see no reason to discuss dicta at all, let alone venture beyond traditional notions of what it is, and many reasons not to. I also dissent from the majority's reversal as to FIR 34. However, I agree with its bottom line on FIR 89, and so concur in that part of the judgment.